OMEGA IMPORTING CORP.,
Plaintiff-Appellant,

v.

PETRI–KINE CAMERA COMPANY, Inc.,
Defendant-Appellee.

No. 303, Docket 71–1919.

United States Court of Appeals,
Second Circuit.

Argued Oct. 15, 1971.

Decided Nov. 8, 1971.

Harry I. Rand, New York City (Botein, Hays, Sklar & Herzberg, and Donald E. E. Nawi, New York City, of counsel), for plaintiff-appellant.

Jacob Freed Adelman, New York City (Salomon & Mainzer, New York City, of counsel), for defendant-appellee.

Before FRIENDLY, Chief Judge, CLARK, Associate Justice Retired,[*] and KAUFMAN, Circuit Judge.

FRIENDLY, Chief Judge:

■ Omega Importing Co., a licensed distributor of cameras bearing the trade-mark Exakta, manufactured in Dresden in the German Democratic Republic (hereafter "East Germany"), appeals from the denial by the District Court for the Southern District of New York of an injunction that would restrain the defendant, Petri-Kine, *pendente lite* from distributing under the same trade-mark cameras manufactured by the Niko Company, Ltd., in Japan with lenses made in the German Federal Republic (hereafter West Germany). Final decision of the action will turn on whether Ihagee Kamerawerk A.G.I.V.,[1] an East German corporation, or Ihagee Kamerawerk, A.G., a West German corporation, is entitled to the trade-mark Exakta in the United States. That issue will have to be determined in light of the facts that the United States recognizes the West German Government as the *de jure* government over the territory it controls but does not recognize the East German Government. See Mann, Germany's Present Legal Status Revisited, 16 Int'l & Comp. L.Q. 760, 779, 789 (1967); Contemporary Practice of the United States Relating to International Law, 57 Am.J. Int'l L. 403, 410 (1963).

The Ihagee camera business in Dresden was founded in 1912 by Johann Steenbergen, a Dutch national. At first a corporation, the business later became a partnership, Ihagee Kamerawerk Steenbergen & Co. After the German attack on Holland in 1940, Steenbergen was taken into custody and the Nazi War Ministry used the plant to make war equipment. Later Steenbergen was given some freedom, although he did not regain control of the plant. It was at this time that the partners formed a corporation, Ihagee Kamerawerk, A. G., to which the partnership transferred all its assets—including three United States registered trade-marks[2]—except buildings, machinery, and equipment, which were leased to the corporation by the partnership. Because the new corporation was largely owned by an enemy alien, the Nazi Government appointed a trustee for it in 1943. The Ihagee plant was almost completely destroyed during the heavy Allied air raid on Dresden on February 13, 1945.

Prior to the war the Ihagee partnership had made extensive sales of cameras in the United States under the names Exakta and Kine-Exakta. Such sales were, of course, interrupted by the war. After the surrender of Germany, the Soviet military administration, which controlled what is now East Germany, appointed a trustee for the property of the Ihagee corporation and of the partnership, and confiscated the share certificates of the corporation, which had been deposited in a Dresden bank. Some-

---

[*] Of the Supreme Court of the United States, sitting by designation.

[1.] The last two initials stand for "In Verwaltung," *i. e.,* under trusteeship, see *infra.*

[2.] Exakta, for cameras and accessories, No. 314,049, registered June 19, 1934; Kine-Exakta, for cameras and accessories, No. 354,241, registered February 8, 1938, and Exaktar, for camera lenses and lens mounts, No. 358,043, registered June 28, 1938. While the registration of the Exakta mark was initially renewed in 1954, it does not appear that the necessary affidavit of use was subsequently filed as required by 15 U.S.C. § 1058(b), and therefore the registration evidently lapsed. Apparently the two other registrations were not renewed.

one, presumably the military administration, created new facilities for the business at Dresden. With the utilization of plans and patents and perhaps some machinery of the former Ihagee corporation, the East German enterprise began to make cameras which were sold under the trade-mark Exakta. In 1947 exportation to the United States was resumed; allegedly such exports have exceeded $10,000,000, retail value.

After the creation in 1949 of the East German Government, the Soviet military administration turned over its functions of administration to that Government. The latter made certain decrees providing for the appointment of a trustee for property owned by aliens. The property of the Ihagee corporation has been managed by a trustee bearing the name "Optic Association of State-Owned Enterprises for Precision and Optical Instruments." All profits have been turned over to the East German Government, with their final disposition to await the conclusion of a peace treaty. This, of course, has not yet occurred.

In 1952 Steenbergen, on behalf of the *partnership*, assigned the United States camera trade-marks to the Exakta Camera Company of America, Incorporated, which brought an action in the District Court for the Southern District of New York against defendants who were selling cameras manufactured in Dresden in this country, under the name Exakta. The court granted summary judgment for the defendants, Exakta Camera Co. of America v. Camera Specialty Co., 154 F.Supp. 158 (1957), on the narrow ground that the conveyance from the partnership to the American company was a meaningless act since the partnership had assigned the trade-marks to the Ihagee corporation in 1941.

In 1959 a meeting of the stockholders of Ihagee, as constituted in 1941, was held in Frankfurt, West Germany. The meeting was attended by Steenbergen and a trustee appointed by a West German court for the heirs of the other stockholders. The stockholders voted to transfer the domicile of the corporation from Dresden to Frankfurt.[3]

Extensive litigation ensued. The East German enterprise brought suits both in West and in East Germany; the latter proceeding does not appear to have been truly adversary. While the West German suit was first begun, the East German proceeding was earlier concluded. A judgment of the district court of Leipzig in favor of the East German enterprise, dated October 26, 1962, was confirmed on December 20, 1963, by the Second Civil Chamber of the Supreme Court of East Germany; these judgments are not in the record before us. After various ups and downs in the lower courts, decision by the Supreme Court of West Germany was rendered on January 30, 1969. In a reasoned opinion it upheld the right of the Ihagee enterprise now domiciled in West Germany to employ in West Germany the trade-marks that had been used before 1945; it refused to recognize the East German judgment because this had been rendered in an action begun after the East German enterprise had submitted itself to the jurisdiction of the West German courts. Although the precise issue was the rights of the respective enterprises to use the trade-marks in West Germany, the court based its judgment on a conclusion that the corporation had continued to subsist and that the transfer of domicile to West Germany was valid.

Legal proceedings also began in the United States. In 1961 the West German enterprise applied to the Patent Office to register Ihagee as a trade-mark for cameras; nothing occurred. Six years later the East German enterprise made a similar application. The Patent Office declared an interference. See 15 U.S.C. § 1066. The matter was heard by a three-member Trademark Trial and Appeal Board, but the West German enterprise made only a written presentation. The Board ruled in favor of the East German enterprise primarily on

---

3. Later the domicile was transferred to West Berlin.

the ground of lack of use by the West German enterprise in the United States; it disregarded the West German judgment on the basis of our decisions in Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 641–643 (2 Cir.), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed. 2d 76 (1956), and George W. Luft Co. v. Zande Cosmetic Co., 142 F.2d 536 (2 Cir.), cert. denied, 323 U.S. 756, 65 S. Ct. 90, 89 L.Ed. 606 (1944), and the Seventh Circuit's decision in Sperry Rand Corp. v. Sunbeam Corp., 285 F.2d 542 (7 Cir. 1960), none of which dealt with the effect of a foreign judgment in regard to the right of a manufacturer to use a particular trade-mark in the United States. In 1967 the East German enterprise also applied to register Exakta as a trademark for cameras. The West German enterprise opposed, and this matter also went to a Trial and Appeal Board. Again the West German enterprise presented no evidence, and the Board held the East German enterprise entitled to register the mark, for reasons similar to those in the Ihagee case. On April 24, 1970, the West German enterprise began a suit in the District Court for the District of Columbia, pursuant to 15 U.S.C. § 1071(b), to review this determination; we are advised that the action is definitely set for trial in January, 1972.[4]

During all this period the West German enterprise made no sales in the United States; indeed, the claim is that it manufactured only 800 cameras in West Germany, and that of these a large number proved inoperable. The present litigation arises from defendant's prospective importation from Japan of cameras bearing the trade-mark Exakta and the name Ihagee. The cameras are manufactured by an established Japanese firm, Niko, from designs made by an employee of the West German firm and presumably with its acquiescence. The lenses are to be made in Germany; whether by the West German "Ihagee" does not appear. As against plaintiff's claims that these cameras will be "junk" which will injure the reputation of the East German Exaktas, defendant responds that they are a quality product and are to sell at prices higher than the Dresden cameras.

The district judge denied a temporary injunction on the ground that, under Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 293 F.Supp. 892 (S.D.N.Y. 1968), aff'd as modified, 433 F.2d 686 (2 Cir. 1970), cert. denied, 403 U.S. 905, 90 S. Ct. 2205, 29 L.Ed.2d 680 (1971), which he regarded as controlling, plaintiff had "not shown sufficient likelihood of success to entitle it to a preliminary injunction." He also concluded that "[n]o irreparable injury to plaintiff has been shown," especially since "[t]he purchaser of an expensive camera who buys on reputation must have considerable knowledge of the camera world and of the Exakta controversy." However, the judge continued a temporary restraining order, which had been granted in April 1971, until an application for a further extension could be made to this court. Another panel extended the restraint until expedited argument of the appeal; at the argument we extended the stay until decision, on condition that plaintiff post a $50,000 injunction bond instead of the nominal $500 bond that had been required when the temporary restraining order was issued.

Plaintiff's case on appeal hinges on Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1204–1207 (2 Cir. 1970). We there held, applying the well-known teaching of Judge Frank in Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2 Cir. 1953), that a temporary injunction should issue when, in his words, a plaintiff "has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation" and "the balance of hardships tips decidedly toward plaintiff," even though

4. According to the parties, a similar action has been brought concerning the decision with respect to the Ihagee mark.

the plaintiff has not demonstrated a strong likelihood of success.[5]

We think appellant is right that here the balance of hardships "tips decidedly" in its favor—although not so dramatically as in *Hamilton,* where denial of a temporary injunction would have brought the plaintiff under the control of a competitor, or in *Semmes,* where it would have forced the plaintiff out of business as a Ford distributor. Here the plaintiff has a substantial business distributing the Dresden made Exakta cameras in the United States.[6] The probabilities of confusion from the sale of another camera bearing the identical name are too obvious to require detailed proof. Even though defendant's cameras are to be stamped "Made in Japan," a purchaser could well think this might be through some arrangement with the Dresden manufacturer. Indeed, plaintiff's affidavits showed that such a confusion was already occurring. In this aspect of the case, the holding in *Zeiss* that confusion could not be avoided because defendant's products were stamped with the name "Jena" or other indications of East German manufacture tends in favor of the plaintiff rather than the defendant, see 433 F.2d at 705–706. The probabilities of confusion could hardly be better demonstrated than by defendant's own price list for dealers, which presents the East and West German Exakta marked cameras in a manner suggesting that they constitute a single line produced by one manufacturer:

| Stock No. | Model Name and brief description | Suggested Minimum | Dealer's NET— | % Profit |
|---|---|---|---|---|
| | CAMERAS—STILL and MOVIE | | | |
| 40 | EXAKTA TWIN TL—Made in Japan F/1.9 Lens | 249.50 | 149.50 | 40 |
| 41 | EXAKTA TWIN TL—50mm, f/1.4 lens | 279.50 | 169.50 | 40 |
| 42 | EXAKTA TWIN TL BODY ONLY | 169.50 | 99.50 | 41 |
| 43 | EXAKTA VX 500, 50mm, f/2.8 Domiplan with case | 79.95 | 49.95 | 38 |
| 44 | EXAKTA VX 500 Body Only | 59.50 | 35.00 | 40 |
| 45 | EXAKTA VX 1000 TL 50mm f/2 pancolar with case | 129.50 | 79.50 | 40 |
| 46 | EXAKTA VX 1000—Body Only | 79.50 | 49.50 | 38 |

Despite appearances, however, only the three Exakta Twin TL models listed are attributable to the West German Ihagee, while the Exakta VX models are all Dresden manufactured. The price differences between the Twin TL and VX lines do not clarify the source. Indeed, there is further evidence suggesting that there is in fact no distinct price difference between the two lines; an exhibit offered by plaintiff indicates that the East German Ihagee is introducing a

5. The district court relied on our still more recent statement in Cerruti, Inc. v. McCrory Corp., 438 F.2d 281, 284 (2 Cir. 1971), that serious issues with respect to trade-marks "should not be determined, even preliminarily, on an incomplete showing by way of affidavits * * * in the absence of clear proof of necessity for interlocutory injunctive relief." Recognizing that principle, plaintiff says that here there was such "clear proof" whereas in *Cerruti* we found there was not.

6. On January 1, 1970, Omega became the sole sales representative for cameras produced by the East German enterprise. With respect to Omega's activities since that time, the district court found there was evidence "that [it] has sold as Exakta cameras 17,000 cameras produced by the [East German enterprise]; that the retail sales price of these 'and accessories' was more than $1,000,000, that Omega has promoted advertising." Moreover, the East German enterprise, with which plaintiff has privity of contract, has been substantially involved in the United States camera and accessories market for more than 20 years through various distributors.

new camera, the Exakta RTL 1000, which will be sold retail for $250, and that the retail price of a particular version of the Exakta VX 1000 is $233.

■■ Under the circumstances here presented, the supposed sophistication of camera buyers cannot be relied on to prevent confusion. The standard to be employed is the ordinary purchaser, not the expert. See e. g., Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc., 395 F.2d 457, 462 (3 Cir.), cert. denied, 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968); 3 Callmann, The Law of Unfair Competition, Trademarks, and Monopolies § 8.12 (3d ed. 1969). To be sure, the cameras here in question are expensive items and thus even the ordinary purchaser would be expected to make more than a casual inspection of the product before buying. Were the trade-marks of the East and West German cameras merely similar, this might mitigate the possibility of confusion. Compare Marks v. Polaroid Corp., 129 F.Supp. 243, 272–273 (D.Mass.1955), aff'd, 237 F.2d 428 (1 Cir. 1956), cert. denied, 352 U.S. 1005, 77 S.Ct. 564, 1 L.Ed.2d 550 (1957). However, in this case, except for reference to the place of manufacture, the names are identical. Consequently, purchaser inspection would be of doubtful value. Moreover, to rely upon clarification through other means such as photographic magazines and dealers—many of whom, on the record before us, are allegedly themselves confused as to the source of Exakta marked cameras—would be to introduce an overly refined view of what the law can reasonably expect of ordinary purchasers of even such expensive merchandise. Indeed, the most accurate characterization of the buyer market for these cameras would very likely be that of one composed of both discriminating and casual, relatively unknowledgeable buyers. In such a case, a court must give consideration to the probability of confusion on the part of the latter as well as of the former. See Oriental Foods, Inc. v. Chun King Sales, Inc., 244 F.2d 909, 915 (9 Cir. 1957).

■ Where there is, then, such high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows. While an injured plaintiff would be entitled to recover the profits on the infringing items, this is often difficult to determine; moreover, a defendant may have failed to earn profits because of the poor quality of its product or its own inefficiency. Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Yet to prove the loss of sales due to infringement is also notoriously difficult, Pure Foods, Inc. v. Minute Maid Corp., 214 F.2d 792, 797 (5 Cir.), cert. denied, 348 U.S. 888, 75 S.Ct. 208, 99 L.Ed. 697 (1954). Furthermore, if an infringer's product is of poor quality, or simply not worth the price, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market. See 3 Callmann, *supra*, § 88.3, at 188. A final consideration is the unlikelihood that defendant, which has just emerged from a Chapter XI reorganization, would, in any event, be able to satisfy a substantial damage award.

■ While even this might not be enough to tip the balance of hardships so "decidedly" as to invoke the *Hamilton-Semmes* principle in a case where a defendant, acting in good faith, was already engaged in sales, consideration here must also be given to the fact that whereas the East German Exaktas have been regularly sold in the United States market at least for the past fourteen years, cameras bearing that mark made under the authority of the West German enterprise have not yet entered the retail market. A few months further delay, pending determination on the governing issue in the District of Columbia litigation, cannot be seriously consequential. *Cf.* American Trampoline Co. v. American Trampoline Corp. of New York, 188 F.Supp. 611, 615 (S.D.N.Y. 1960); Carling Brewing Co. v. Philip Morris, Inc., 277 F.Supp. 326, 337 (N.D.Ga. 1967); Rogers Silverware Redemption Bureau,

Inc. v. Rogers Silver Premium Bureau, Inc., 133 Misc. 676, 677, 233 N.Y.S. 286, 287 (1929). See also Hamilton Watch Co. v. Benrus Watch Co., *supra*, 206 F.2d at 742–743.

The more doubtful question is whether plaintiff has satisfied the other branch of the *Hamilton-Semmes* test, namely, the requirement of having "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." The problems with which the *Zeiss* courts had trouble related to the Carl Zeiss Stiftung, a foundation; they experienced little difficulty in holding that the corporation there involved, Zeiss Ikon A.G., had succeeded in transferring its domicile from Jena in East Germany to Stuttgart in West Germany by shareholder proceedings in Stuttgart essentially similar to those conducted in Frankfurt by the shareholders of the West German Ihagee. See 293 F.Supp. at 914–915, aff'd without further discussion, 433 F.2d at 703. The only bases for distinction we can perceive lie in Judge Mansfield's emphasis in *Zeiss* on "the tendency of continental Civil Code countries to associate nationality or domicile more with the place of principal establishment than the state of origin," citing Note, Corporations in Exile, 43 Colum.L.Rev. 364 (1943); the fact that prior to Soviet expropriation of its assets, Zeiss Ikon A.G. had plants in Stuttgart and Berlin as well as in Dresden, as contrasted with Ihagee's total lack of operations except in Dresden; and a provision in the by-laws of Zeiss Ikon A.G. permitting stockholders' meetings in Stuttgart as well as in Berlin, Jena, and Dresden. As against these possibly substantial grounds for distinction, we have the de-

cision of the highest court of West Germany in an adversary proceeding brought by the East German enterprise against the West German enterprise in this case that the domicile of Ihagee Kamerawerk, A.G. had been validly transferred to West Germany. Even though the precise issue there being litigated was trademark rights in West Germany, collateral estoppel would very likely apply if this were a domestic judgment, since decision turned on the validity of the transfer of domicile, "both causes of action arose out of the same subject matter," ALI, Restatement of Judgments § 70 (1942), and the East German enterprise had both the opportunity and the incentive to litigate the case fully.[7] *See* Currie, Mutuality of Collateral Estoppel: Limits of the Bernhard Doctrine, 9 Stan.L.Rev. 281, 283, 285 (1957); Polasky, Collateral Estoppel —Effects of Prior Litigation, 39 Iowa L.Rev. 217, 222–28 (1954). From what is now before us we do not see why such effect should not be given to the West German judgment on the question of the West German enterprise's legal status, see *Zeiss, supra*, 293 F.Supp. at 908; Leo Feist, Inc. v. Debmar Publishing Co., 232 F.Supp. 623, 624 (E.D.Pa. 1964); Smit, International Res Judicata and Collateral Estoppel in the United States, 9 U.C.L.A.L.Rev. 44, 48–56 (1962); *cf.* Hilton v. Guyot, 159 U.S. 113, 163–164, 16 S.Ct. 139, 40 L.Ed. 95 (1895)[8]—although we recognize there are a variety of policy considerations which in any given case may dictate that the decision of a court of a foreign nation should not be given effect, see Reese, The Status in This Country of Judgments Rendered Abroad, 50 Colum.L.Rev. 783, 785, 789–99 (1950). In any event, the contrary East German judgment would not militate against giving effect to the West

---

7. The parties to this action would be bound as privies of the parties to the West German litigation. *Cf.* ALI, Restatement of Judgments, § 83 (1942); Polasky, Collateral Estoppel—Effects of Prior Litigation, 39 Iowa L.Rev. 217, 241–42 (1954).

8. While West Germany might not have been the most favorable forum for the

East German enterprise, the latter selected it. The case for giving effect to the West German judgment might stand differently if the West German enterprise had sued the East German one in West Germany. But *cf. Zeiss, supra*, 293 F. Supp. at 908.

German decision for the reason, among other possible ones, *cf*. 293 F.Supp. at 906–908, that so far as appears, the East German courts obtained no jurisdiction over the West German enterprise.

On the other hand, the district court here did not have the benefit of the views of experts on German law as the court did in *Zeiss*. Moreover, the only tribunal in the United States, the Trademark Trial and Appeal Board, which has considered the question of title to the Exakta mark has ruled in favor of the East German enterprise, although we are far from being overwhelmed by its reasoning. We therefore believe Omega has satisfied the second branch of the *Hamilton-Semmes* test, albeit by an exceedingly thin margin.

▉ We thus conclude that equity requires issuance of a temporary injunction pending the hearing and decision of the District Court for the District of Columbia in the proceeding between the two German entities, and that, upon the making of such a decision, continuation of the injunction should be reconsidered by the district court. In so ruling we recognize the frequent statements that the discretion of a district judge in refusing or granting a temporary injunction will generally be respected. See 4 Calmann, *supra*, § 88.3(a), at 189, and the many cases there cited. Against this are the principles that "the general purpose of a preliminary injunction is to preserve the *status quo* pending final determination of the action," Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 204 (2 Cir. 1966), quoting 7 Moore, Federal Practice ¶ 65.04 [1] (2d ed. 1955), and that the showing required in such a case is less strong than when the injunction would require costly changes in existing operations. See 4 Callmann, *supra*, § 88.3(a), at 194, and cases there cited. Such general statements are less useful in deciding concrete

cases than is sometimes thought; often they merely rationalize conclusions already reached. They are somewhat reminiscent of canons of statutory construction, with respect to which, as Professor Llewellyn amusingly demonstrated, every thrust has an equivalent counterthrust.[9] See also National Ass'n of Letter Carriers v. Sombrotto, 449 F.2d 915, 921 (2 Cir. 1971). An appellate court must indeed accept a district court's assessment of credibility, see Harlem River Consumers Cooperative, Inc. v. Associated Grocers of Harlem, Inc., 450 F.2d 271, 274 (2 Cir. 1971), and give proper regard to its finding of facts, F.R.Civ.P. 52(a), and even to its "feel" of the case. But Congress would scarcely have made orders granting or refusing temporary injunctions an exception to the general requirement of finality as a condition to appealability, 28 U.S.C. § 1292(a) (1), if it *intended* appellate courts to be mere rubber-stamps save for the rare cases when a district judge has misunderstood the law or transcended the bounds of reason.

We therefore direct the issuance of a temporary injunction pending the decision in the District of Columbia action between the two principals. Once that case has been decided by the district court for the District of Columbia, the district court here shall determine, after notice and opportunity for argument, whether the injunction should be continued pending any appeal that may be taken in that case; it may also reconsider the continuance of the injunction, on notice and opportunity for argument (and if either party desires, the presentation of further evidence), if it should become apparent that the trial in the District of Columbia will not take place as soon as now expected. In light of the district judge's concern and appellant's agreement, the injunction shall be conditioned on Omega's ceasing to claim

---

9. This was initially published as Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes are to be Construed, 3 Vand.L.Rev. 395, 401–06 (1950). It is reprinted, with minor changes, in Llewellyn, The Common Law Tradition; Deciding Appeals 521 et seq. (1960).

the East German camera to be an "original" Exakta. It shall also be conditioned on the posting of a $50,000 injunction bond not later than November 16, 1971. We think it proper that the costs of this appeal shall abide the ultimate outcome.

It is so ordered.