**PLUS PRODUCTS, Plaintiff,**

v.

**PLUS DISCOUNT FOODS, INC. and The Great Atlantic & Pacific Tea Company, Inc., Defendants.**

**No. 80 Civ. 6224 (RWS).**

United States District Court,
S.D. New York.

Feb. 18, 1983.

Townley & Updike, New York City, for plaintiff; James B. Swire, Robert L. Raskopf, New York City, of counsel.

Pattishall, McAuliffe & Hofstetter, Chicago, Ill., Cahill, Gordon & Reindel, New York City, for defendants; Robert M. Newbury, Mark V.B. Partridge, Chicago, Ill., of counsel.

### OPINION

SWEET, District Judge.

Plaintiff Plus Products ("Products") commenced this trademark infringement and

unfair competition action against defendants Plus Discount Foods, Inc. ("Foods") and its parent The Great Atlantic & Pacific Tea Company, Inc. ("A & P"), seeking to enjoin Foods from the use of the mark "PLUS" with respect to its retail food stores and private label brands. On the basis of the following findings of fact and conclusions of law, final judgment will be entered granting certain, but not all, of the injunctive relief sought by Products.

*Prior Proceedings*

This action was commenced by the filing of a complaint on October 31, 1980. Discovery was had and a bench trial conducted from September 13 to September 16, 1982. Final submissions were filed on November 1, 1982 and final argument held on November 19, 1982.

## FINDINGS OF FACT

*The Parties*

Products, a California corporation, was founded in 1939 and is a wholly owned subsidiary of Richardson-Vicks, Inc. ("RVI") of Wilton, Connecticut, having been acquired in May, 1980. Its principal place of business is Irvine, California. It has continuously done business under the trade name Plus Products.

Products is the proprietor of Registration No. 789,307 issued May 11, 1965 in the United States Patent and Trademark Office for the trademark PLUS for High Protein Vitamin Products and Mineral Food Fortifiers and is also the proprietor of Registration No. 1,035,610 issued March 16, 1976 in the United States Patent and Trademark Office for the trademark PLUS for hand and body lotions, creams, and oils, Registration No. 1,096,407 issued July 18, 1978 for the trademark PLUS with design for cosmetic cleansing and moisturizing creams, lotions and gels, skin toner, hair shampoo, toilet soap, and dietary supplements, and of Registration No. 1,133,474 issued April 22, 1980 for the trademark PLUS ONE–UP for dietary supplements.

Products has used several different logos containing the word "PLUS" for its line of vitamin, mineral, and food supplement products. Its present logo was adopted in 1972 and features the word PLUS in block letters with a plus symbol over a red dot inside the loop of the "p".

Products has used the PLUS mark continuously since 1939 for its line of vitamins, minerals and food fortifiers, which were initially sold by mail order. Sales through health food stores and jobbers began in 1960. Commencing on or about 1962, Products introduced a line of health and beauty aids under its PLUS mark, including skin and hair care products which were also sold in retail food stores. Products has also used the PLUS mark for spices and cooking oil products since about 1963 and for pet food supplements since 1972. In addition to sales under the PLUS mark, Products has for many years made and sold a line of food products under the mark TIGER'S MILK and related marks. This line has included TIGER'S MILK cookies, snack or nutrition bars, nutrition boosters and milk shakes, TIGERONI cheese mix, spaghetti sauce mix, macaroni and spaghetti, and TIGER tea. The TIGER'S MILK line has been promoted regularly as part of the PLUS line, and is distributed to grocery and supermarket outlets. Its product line was expanded last July by introducing PLUS breakfast bars.

In its advertising and promotional literature for such products, Products is identified by the trade name PLUS. From 1970 to 1979 Products expended in excess of $6 million in advertising and promoting goods under the PLUS name primarily through health food publications, and had sales of approximately $75 million under the PLUS mark. Its products sold under the PLUS mark are known for high quality.

Since 1970, Products has sent cease and desist letters to many companies concerning over 130 different uses of the word PLUS, but it has never brought suit in court to enforce alleged rights in PLUS prior to this action.[1] Certain companies acceded to

1. Products has, however, filed numerous opposition proceedings in the Patent and Trademark

Product's demands. In 1976, American Diet-aids Company, Inc. ("Dietaids") prevailed in a declaratory judgment action it commenced against Products after receiving cease and desist correspondence. This court held that Products was estopped from asserting a claim of trademark infringement against Dietaids and that there was no likelihood of confusion between the parties' products. *American Dietaids Co. v. Plus Products,* 412 F.Supp. 691 (S.D.N.Y.1976), *aff'd,* 551 F.2d 299 (2d Cir.1976). In 1977, Products filed a statement with the Securities and Exchange Commission in which it stated it had determined that trademark protection costs were no longer of benefit due to unfavorable lawsuit judgments.

In 1977 RVI's predecessor in interest, Richardson-Merrell, Inc., recognizing the growing national interest in and demand for health food and high quality nutritional products, began negotiations to purchase Products. RVI has proven expertise in the mass marketing of such products as Oil Of Olay beauty lotion, Lavoris mouthwash, and Clearasil skin products. Negotiations were broken off, resumed, and finally culminated in RVI's purchase of Products in May, 1980.

Supermarkets have for many years sold vitamin and mineral products in regular health and beauty aid sections. Commencing in the early to mid-1970's, the growth in popularity of nutritional foods led to the development of nutritional centers or health food sections in supermarkets. These centers, which first began appearing on the west coast, create the image of a high quality health food store within the supermarket, preserving the health food image of the products sold in the section and allowing for the sale of higher priced goods.

By August, 1980, RVI had established a company policy designed to increase the penetration of PLUS Products into super-market nutrition centers. At the time this policy was being formulated, the PLUS line was already in nutrition centers in three retail accounts, representing about 40 outlets on the west coast. By the end of 1981, the PLUS line was in over 35 supermarket accounts with 923 outlets. Consistent with the development of the growth of nutritional centers from west to east, only 38 of the 923 outlets were located on the east coast.

Defendant Foods is a Delaware corporation incorporated in 1979 as a wholly-owned subsidiary of defendant A & P, a New Jersey corporation with its principal place of business in Montrose, New Jersey. Foods uses the PLUS logo for limited assortment discount food stores and one limited assortment warehouse store. Its Plus stores sell private label items identified with the generic product name and the store logo, as well as established national brands. The logo features the word PLUS with a blue and orange border and the slogan "Priced Low-U Save".

In January 1979, the Tenglemann Group, a large German food retailer, purchased over 42% of the stock and operating control of A & P. Tenglemann had for a number of years operated a chain of small discount food stores in Germany under the name PLUS.[2] The PLUS stores in Germany also carried a large number of private label items bearing the PLUS logo. A & P decided to investigate instituting a PLUS line of stores in this country and by January 15, 1979, its legal department had commissioned a trademark and trade name search for PLUS for supermarket services. The first three marks shown in the report received by A & P in late January 1979 were registrations by Products. Products also appeared on the trade name part of the search. No third-party registrations for PLUS in the same or similar business ap-

Office. *See, e.g., Plus Products v. Natural Organics, Inc.,* 204 U.S.P.Q. (BNA) 773 (T.T.A.B. 1979) (NATURE'S PLUS); *Plus Products v. Redken Laboratories, Inc.,* 199 U.S.P.Q. (BNA) 111 (T.T.A.B.1978) (pH PLUS); *Plus Products v. General Mills, Inc.,* 188 U.S.P.Q. (BNA) 520 (T.T.A.B.1975) (PROTEIN PLUS), *aff'd,* 534 F.2d 336 (C.C.P.A.1976).

2. The Tenglemann Group stores in Germany use a logo identical to Foods', but in place of "Priced Low-U Save" is the slogan "Prima Leben und Sparen," which means "prime living and saving." The word PLUS has essentially the same meaning in English and in German.

peared. When Foods and A & P attempted to register PLUS for supermarket services, the United States Patent and Trademark Office examiner refused registration because, *inter alia,* of likely confusion with Products' registration for goods.

After receiving the search results revealing plaintiff's registrations, A & P retained the services of outside trademark counsel to advise the company with regard to the proposed adoption of the trade name and trademark PLUS. Counsel advised defendants not to employ the PLUS logo on vitamins, shampoos, beauty preparations and beauty soaps. The remainder of the advice was shielded at the trial by the attorney-client privilege. A & P also considered and tested consumer reactions to the use of other marks such as Lo-Lo. The PLUS mark did not test as well as other marks in the survey.

A & P elected to adopt the word PLUS as a trade name and trademark in connection with its proposed chain of discount food stores. It designated Fritz Teelen as the president of Foods, and incorporated it as a wholly-owned subsidiary in April, 1979. Teelen had been executive vice-president of the Tenglemann Group and had been responsible for the development of the PLUS name, logo, labels, and concepts that had been in use in Germany by the Tenglemann Group since 1972. A & P sought to save time and financial resources by transferring this experience with the PLUS name to the United States. Teelen testified that he was unaware of Products' use of the PLUS mark.

Foods opened its first two low-cost, no-frills discount food stores in the Northeast in August, 1979 under the trade name PLUS. It had 61 stores by the end of September, 1980; the maximum number in operation was 81 at the beginning of 1981. Currently, there are thirty-eight operating stores. Advertising for its stores appears primarily in local newspapers and store circulars. Foods has had over $400 million in sales and has spent over $5 million in advertising.

The Foods stores offer consumers lower prices in exchange for the absence of amenities. Consumers have to bag their own goods, there is no check cashing, and merchandise is sold out of cartons and bins. In addition to stocking national brands, hundreds of private label items are sold under the trademark PLUS. Shelf talkers bearing the PLUS mark are also used in connection with non-private label items. Among the products sold by Foods under its private label are spices, food oils, and pet food. Foods' stores are smaller and carry fewer items than conventional supermarkets and are located on the East Coast and in the Chicago area.

*The Instant Dispute*

The Wall Street Journal published an article on July 9, 1979 about A & P's plans to open a chain of PLUS stores. The article did not mention the type of stores contemplated or that the stores would carry PLUS trademarked goods. This . article was brought to the attention of Richardson-Merrill who in turn pointed it out to counsel for Products in the course of the negotiations for the purchase of Products. Counsel for Products wrote to A & P on September 17, 1979, expressing concern about the prospect of Foods' stores being identified with Products. Upon receipt of the letter, A & P again contacted outside counsel, which stated its belief that no confusion would result. A & P responded to Products by letter in October, 1979, stating that it did not believe there was a prospect of confusion.

No actual confusion on the part of consumers between Products' items and those sold by Foods has been brought to this court's attention. In one instance in New Jersey, a newspaper employee investigating a consumer complaint about a product purchased at a Foods store wrote to Products on the misapprehension that it was the operator of the Foods stores. The confusion appeared, however, to result from a clerical error rather than from confusion as to the source of the goods.

Products commissioned an independent survey of food shoppers residing within a mile of a Foods store. The survey began by

eliciting the respondents' awareness of Foods' stores. This was done using an aided technique whereby the respondent was shown several cards each with the logo or name of a store. One of the cards bore Foods' logo. The next question, also aided, elicited awareness of Products' vitamins using the same technique. The key question asked the respondent to select the store or stores that were likely to sell a particular vitamin brand. This question was presented by showing the respondent the vitamin brand cards one at a time and asking him or her to select the appropriate store or stores from among the cards bearing the store logos.

Twenty-six percent of those surveyed identified PLUS stores as a likely source of PLUS vitamins. When the 26% were questioned as to why they thought PLUS vitamins were sold in PLUS food stores, 91% responded that the PLUS vitamin name was the name of Foods' stores. Expert testimony was received to the effect that the likelihood of confusion will increase as either Products or Foods or both get greater exposure and that Products' image as a high-quality manufacturer will be diminished. This conclusion was buttressed by an expert in retail supermarket operations.

The survey universe was directed to members of households who do most of the household's food shopping. The universe surveyed included 35% of respondents who were not purchasers of vitamins, nor could it be established from the survey if any respondent is a vitamin user or had a current purchasing interest in vitamins at the time of the survey. The survey elicited little demographic information, particularly in terms of buying habits and income.

## CONCLUSIONS OF LAW

Products' claims are for trademark and trade name infringement pursuant to the Lanham Act, 15 U.S.C. §§ 1051–1127, and for unfair competition under state law. A claim is also asserted under the New York anti-dilution statute, N.Y.Gen.Bus.L. § 368–d. The crucial issue in the infringement and unfair competition claims is

"whether there exists a likelihood that an appreciable number of ordinary prudent purchasers will be misled, or simply confused, as to the source of the goods in question." *Lever Bros. Co. v. American Bakeries Co.,* 693 F.2d 251, 153 (2d Cir. 1982). This likelihood of confusion standard applies whether or not the products in question are in direct competition. *See id.; Spring Mills, Inc. v. Ultracashmere House, Ltd.,* 689 F.2d 1127, 1129 (2d Cir.1982); *American Int'l Group, Inc. v. London American Int'l Corp.,* 664 F.2d 348, 351 (2d Cir. 1981); *Vitarroz v. Borden, Inc.,* 644 F.2d 960, 966 (2d Cir.1981).

Products argues that as the senior user of PLUS and the owner of several PLUS registrations it is entitled to injunctive relief based solely on Foods' use of its PLUS logo on goods that are substantially the same, noting that both parties sell various salad and cooking oils, seasonings, health and beauty aids, dog and cat foods, and vitamins. Our Court of Appeals has recently noted that when a junior user has affixed a senior user's mark to substantially identical products directed at the same market and sold through the same outlets, likelihood of confusion may be found as a matter of law. *Vitarroz v. Borden, Inc., supra,* 644 F.2d at 966. Those circumstances are not present here. The senior user is not entitled to injunctive relief "solely on the basis of the similarity of the marks and the proximity of the products." *Id.* Therefore, inquiry into the likelihood of confusion is required.

### A. Likelihood of Confusion

Before considering the standards for assessing the likelihood of confusion under the relevant authority, certain of the facts set forth above should be noted. Only a few of the goods involved here overlap. The majority of the parties' offerings, however, do not directly overlap. Products is currently primarily a seller of vitamins, minerals, and food supplement products, along with some health and beauty aids. Foods is a discount chain that currently sells primarily basic food items, using the PLUS logo as a trade name for its stores

and as a trademark for its private label merchandise, all of which is sold at the stores.

The parties' offerings thus may be characterized as "related." In addition, from the facts as found above, an area of potential direct competition exists in health food products. These items are currently sold by Products in nutrition centers in supermarkets and while some of the types of products sold by Products are currently sold in Foods stores, none are sold under its private label. Nevertheless, RVI is an aggressive merchandizer and health food products are ill-defined. Indeed, the record contains the suggestion that any "natural" food products can be considered health foods. Therefore, Products may well bridge the gap into what might be considered conventional food products. Indeed, its offering of salad oil suggests that it is already there.[3]

Furthermore, the difficulty of analysis is deepened by the functional differences between the parties. Foods is primarily a retailer which sells some products under its own label. Products is a manufacturer, some of whose products are sold at retail in stores similar to those operated by Foods. As Foods put it on final argument, "The main thing is that these businesses are totally unrelated. They have no relationship." Technically, the statement is true, but the concern here is for protection of the public from confusion as to the origin of the goods in issue. *See Berlitz Schools of Languages v. Everest House,* 619 F.2d 211, 214 (2d Cir.1980). Thus, the functional difference between the parties is not enough to bar relief if likelihood of confusion is shown.

Although no precise precedent has been presented, the most helpful tools for analysis of the likelihood of confusion are the commonly accepted factors enumerated in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). This is, of course, both a competing and non-competing goods case, as well as a so-called reverse confusion as to source case.[4] Although it is the function of the law to seek order and to defeat confusion and uncertainty whenever possible, because of the facts presented here, some of the accepted labels proffered by counsel tend to come unstuck.[5] For the same reason, characterization of this action as a particular species of trademark litigation seems imprudent. In any event, the *Polaroid* analysis has been extended beyond its initial application, *see American Int'l Group, Inc. v. London American Int'l Corp., supra,* 664 F.2d at 351 (*Polaroid* analysis proper in case of competing as well as non-competing goods); *Vitarroz v. Borden, Inc., supra,* 644 F.2d at 966–67 (same), and is the most useful path to reso-

---

**3.** The direct competition alleged by Products in spices relates currently only to garlic tablets, used not for seasoning, but for what is considered by some to be health reasons. However, given the elasticity of the health food category, the current vogue in nutritional products and the effectiveness of merchandising which is the hallmark of both parties, potential competition in products is probable.

**4.** Reverse confusion is so-called because it differs from the type of confusion generally addressed in trademark infringement actions. In the majority of cases, the plaintiff sues claiming that consumers will buy the defendants product believing that its source is the plaintiff. In the reverse confusion case, the plaintiff's complaint is that consumers will believe that the defendant is the source of the plaintiff's goods. *See Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365, 1371–72 (10th Cir.1977), *cert. dismissed,* 434 U.S. 1052,

98 S.Ct. 905, 54 L.Ed.2d 805 (1978). *See also Capital Films Corp. v. Charles Fries Prod., Inc.,* 628 F.2d 387, 394 (5th Cir.1980); *Scott v. Mego Int'l, Inc.,* 519 F.Supp. 1118, 1126 n. 21 (D.Minn.1981).

**5.** For example, Products argues that this is not a non-competing goods case and that the *Polaroid* analysis is therefore not necessary. As noted below, however, the *Polaroid* analysis is no longer restricted only to non-competing goods cases. Products also argues that *Spring Mills, Inc. v. Ultracashmere House, Ltd., supra,* has altered the *Polaroid* analysis by allowing for a reduced consideration of some factors when there is a strong showing with respect to other factors. The *Spring Mills* court did not address all the *Polaroid* factors, however, because that was sufficient to warrant reversal of the district court. At the trial court level, consideration of each of the *Polaroid* factors is required.

lution and of this controversy, as recognized by the parties in their post-trial submissions.

The *Polaroid* factors are: the strength of the plaintiff's mark; the degree of similarity between the two marks; the proximity of the products; the likelihood that the prior owner will bridge the gap; the presence of actual confusion; the defendant's good faith; the quality of the defendant's product; and the sophistication of the buyers. 287 F.2d at 495. Of these, several are useful in assessing the likelihood of confusion. They are considered below.

### 1. The Strength of the Mark

■ The "strength" of a mark depends on its "origin-indicating" quality in the eyes of the purchasing public. As the court noted in *McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979):

> The term "strength" as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.

For the purposes of assessing their strength, trademarks are generally classified as generic, descriptive, suggestive, or arbitrary or fanciful, with generic marks being the weakest and subject to no protection, while arbitrary or fanciful marks are the strongest. *Id.* Marks that lack distinctiveness and fall on the lower end of the scale are classified as weak and are entitled to a limited scope of protection. *See Sun Banks of Florida v. Sun Federal Savings & Loan,* 651 F.2d 311, 315–16 (5th Cir.1981).

Products' PLUS mark is suggestive. As the U.S. Patent and Trademark Office Trademark Trial and Appeal Board ("TTAB") has observed in the course of opposition proceedings initiated by Products, " 'PLUS' is a dictionary word which denotes something better or an additional quality or quantity and, as such, possesses a highly suggestive significance as applied to most classes of goods." *Plus Products v.*

*Redken Laboratories, Inc.,* 199 U.S.P.Q. (BNA), 111, 116 (T.T.A.B.1978). The distinction between a suggestive mark and a descriptive mark is not always easy to discern. *See e.g., Franklin Knitting Mills, Inc. v. Fashionit Sweater Mills, Inc.,* 297 F. 247, 248 (2d Cir.1923), aff'd, 4 F.2d 1018 (2d Cir.1925). The court in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir.1976) suggested the following formulation:

> A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

537 F.2d at 11 (quoting *Stix Products, Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479, 488 (S.D.N.Y.1968)). The term "PLUS" suggests that the product contains something extra without specifically defining what that might be. It therefore falls on the suggestive side of the line.

Products' mark is not very distinctive. As in *Ashe v. Pepsico, Inc.,* 205 U.S.P.Q. (BNA) 451, 456 (S.D.N.Y.1979), involving a dispute over the term ADVANTAGE, the word PLUS is simply lacking in originality and uniqueness. Furthermore, its frequent usage by others to identify different products is an indication that the mark is weak. *Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp.,* 308 F.2d 196, 199 n. 2 (2d Cir. 1961). Extensive third party use is shown here by Products' cease and desist correspondence. Since 1970 Products has sent demand letters involving over 130 different uses of PLUS for various goods and services.[6]

Furthermore, in the context of an opposition proceeding, the TTAB has stated its view that in a trademark sense, PLUS is a weak rather than an inherently strong mark. *Plus Products v. General Mills, Inc.,* 188 U.S.P.Q. (BNA) 520, 522 (T.T.A.B.1975), aff'd, 534 F.2d 336 (C.C.P.A.1976). *See also*

---

**6.** The great majority of these uses employed the word PLUS in combination with other words, for example "pH PLUS," "NATURE PLUS," and "ALKA–SELTZER PLUS."

*Plus Products v. Medical Modalities Assoc., Inc.,* 211 U.S.P.Q. (BNA) 1199, 1207 (T.T.A.B.1981). This conclusion is persuasive on the issue of weakness. *See Flavor Corp. of America v. Kemin Indus., Inc.,* 358 F.Supp. 1114, 1119 (S.D.Iowa 1973), *aff'd,* 493 F.2d 275 (8th Cir.1974).

In sum, the PLUS mark is not inherently strong and does not possess distinctive qualities. It is, however, suggestive as opposed to descriptive or generic. This factor weighs slightly against Products.

## 2. Similarity of the Marks

While the logos of both parties feature the word "PLUS" in somewhat similar script, the designs of the respective logos are different. Foods uses a blue and orange outline in connection with the word "PLUS" and the words "Priced Low-U Save," while Products uses the word "PLUS" with a white plus sign within a red circle in the center of the "P." The inquiry does not, however, stop there. In assessing the degree of similarity between two marks it is the effect upon prospective purchasers that is important. *Spring Mills, Inc. v. Ultracashmere House, Ltd., supra,* 689 F.2d at 1130 (quoting *McGregor-Doniger, Inc. v. Drizzle, Inc., supra,* 599 F.2d at 1133). Thus, the setting in which a designation is used, because it affects the appearance and colors the impression conveyed by the mark, must be analyzed. *Id. See also Information Clearing House, Inc. v. Find Magazine,* 492 F.Supp. 147, 157–58 (S.D.N.Y.1980); *Clarks of England, Inc. v. Glen Shoe Co.,* 485 F.Supp. 375, 378–79 (S.D.N.Y.1980). *Cf. RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1060 (2d Cir.1979).

Products' mark is displayed on the goods it sells as well as in advertising literature. Foods' mark is affixed to its private label goods and is used as a tradename. Thus, the setting, in the sense that both marks are used as labels for consumable goods, is similar. Also, while the physical appearance of the logos is different, the distinction is not so great as to create a lasting impression in the mind of the consumer. The primary feature of both logos is the word PLUS, in similar script. The additional ornamentation used by each party is not enough to dispel the impression of similarity. This factor weighs in favor of a likelihood of confusion.

## 3. Proximity of the Products and the Likelihood of Bridging the Gap

The earlier discussion of this vexing issue suggests the difficulty of its resolution. Certain of the parties' offerings overlap, for example some health foods, vitamins, dog and cat foods. The greater part, however, are in areas that might best be described somewhat nebulously as "related." Nevertheless, what is important in this area is "the likelihood that customers may be confused as to the *source* of the products, rather than as to the products themselves." *McGregor-Doniger Inc. v. Drizzle, Inc., supra,* 599 F.2d at 1134 (emphasis in original). Thus, "the concern is not direct diversion of purchasers but indirect harm through loss of goodwill or tarnishment of reputation." *Id.* at 1134–35. *See also Spring Mills, Inc. v. Ultracashmere House, Ltd., supra,* 689 F.2d at 1134. *See generally* 3 R. Callmann, *The Law of Unfair Competition, Trademarks, and Monopolies* § 82.2(c) (3d ed. 1969).

The essential question here, then, is whether the nature of the products and the structure of the relevant markets is such that consumers are likely to perceive the goods in question as emanating from a common source. *Vitarroz v. Borden, Inc., supra,* 644 F.2d at 967. *See also Spring Mills, Inc. v. Ultracashmere House, Ltd., supra,* 689 F.2d at 1134 (purchaser could assume that goods belonged to same genre and might well have same source). This question was discussed in a similar context in *Standard Brands, Inc. v. Smidler,* 151 F.2d 34 (2d Cir.1945). In that case, the purveyor of "V–8" brand vitamins claimed that it had not infringed the mark "V–8" for vegetable juice since the former was not a food and was sold in drug stores, not supermarkets. The court rejected the argument, stating:

We do not find it necessary to decide whether or not vitamin tablets are properly to be classified as a food in the same category with vegetable juice within the meaning of [the federal trademark laws]. They are eaten with food and are widely represented to supplement it by the addition of properties essential to health in which the diet of the user may be deficient for one reason or another. It might reasonably be expected that a manufacturer or distributor of food would also make or distribute vitamin tablets.

*Id.* at 37. *See also Aunt Jemima Mills Co. v. Rigney & Co.*, 247 F. 407, 410 (2d Cir. 1917), *cert. denied*, 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540 (1918).

Thus, the court recognized an expectation on the part of the buying public that the business of a food manufacturer encompasses the manufacture of vitamins. This is even truer in today's market where the public is increasingly exposed to corporate diversification and mass merchandising, and thus is more likely to connect two complementary products with the same source. *See, e.g., Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167, 1174–75 (2d Cir.1976). This is particularly true in light of the fact that supermarkets frequently sell such items as vitamins, minerals, and food supplements. Thus, the fact that Products' merchandise is sold primarily in health food stores and nutrition centers and not in the general merchandise section of supermarkets does not weaken the conclusion that the goods are proximate.

Some recent cases have held that food items of greater similarity than those involved in this case have only slight proximity. For example, in *Vitarroz Corp. v. Borden, Inc., supra,* the court found no confusion between the use of BRAVOS for corn chips and BRAVOS for crackers, stating:

[T]he products in this case differ in ways that may be deemed material to consumers. Although both are snack foods that can be eaten plain or used as scoops for dips, only the crackers are ordinarily buttered or served with hors d'oeuvres. In addition, the ingredients of the products are markedly different. The crackers are flour-based and essentially bland, while the chips are corn-based, and heavily salted, and spicy. The products also differ in the way they are prepared; the crackers are baked, but the chips are fried.

644 F.2d at 967. The court also noted the difference in the marketing of crackers sold in specialty stores and in specific sections of supermarkets and corn chips sold in other sections of supermarkets.

With regard to the structure of the market, both products are eventually sold to consumers in retail stores. However, since "modern marketing methods may tend to unify widely different types of products in the same retail outlets or distribution networks," *Continental Connector Corp. v. Continental Specialties Corp., supra,* 492 F.Supp. at 1096, this factor is not of overriding importance. Within retail food stores the record shows that the products are shelved in different sections whenever space permits, the crackers in the "cookies and crackers" section, and chips in the section for "salty, crunchy snacks." More important, the record shows that Vitarroz targets its products at a distinct group of consumers, who shop for the Vitarroz name in specialty stores, many of which do not carry Borden's chips. This factor is entitled to weight, just like the analogous factor of the sophistication of relevant purchasers. *See McGregor-Doniger, Inc. v. Drizzle, Inc., supra,* 599 F.2d at 1137–38; *Taylor Wine Company v. Bully Hill Vineyards, Inc.,* 569 F.2d 731, 733 (2d Cir.1978); *Omega Importing Corp. v. Petri-Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir. 1971).

*Id. See also Buitoni Foods Corp. v. Gio. Burton & C.S. p.a.,* 680 F.2d 290, 292 (2d Cir.1982) (table wine on one hand and brandies, liqueurs, aperitifs on the other have slight proximity). Nevertheless, each case must be determined on its own unique facts. Here, the proximity of the products is such that there is a danger that consumers will believe that the products in question have a common source, although the

danger is slight given the different modes in which the parties' merchandise is sold.

The likelihood of bridging the gap has already been discussed, *see* text accompanying note 3 *supra,* and weighs slightly in favor of finding a likelihood of confusion.

### 4. Actual Confusion

No instances of actual consumer confusion were presented. The survey presented by Products was defective in several respects. It was directed to consumers within a relatively close geographical proximity to Foods' stores and the method of questioning tended to maximize association with the word "PLUS."[7] There was no evidence that the universe addressed by the questionnaire was typical of consumers at large or indeed consumers of vitamins as such. Therefore, the probative value of the survey is limited.

### 5. Quality of the Product

Products has stressed its image as a top-of-the-line product and Foods makes no bones of its image as a discount, no-frills purveyor. This may logically create an image in the minds of some that Foods' offerings are of lower quality, although there has been no showing that such is the case. This factor weighs slightly in Products' favor.

### 6. Sophistication of Buyers

No substantial evidence was presented by either party with respect to an analysis of the consumers of Products' goods or the buyers in Foods' stores. Expert testimony was presented emphasizing the care and sophistication of health food and vitamin buyers, but this opinion evidence failed to advance the field of this court's knowledge much beyond the common understanding derived from day to day living and occa-

sional forays into supermarkets and even health food stores.

The difficulty of assessing this factor is compounded by the nature of the confusion alleged here. The buyer of vitamins and health foods is likely to be somewhat discriminating and sophisticated, and is therefore unlikely to confuse Foods' image with Products'. On the other hand, as already noted, the health food industry is increasingly penetrating the buying habits of the general public. In addition, the trend of Products' business is toward increased diversification into the fringe of the health food market, where the distinction between "food" and "health food" begins to blur. These competing considerations, while weighing slightly in favor of Foods, render this factor relatively unhelpful to the resolution of this dispute.

### 7. Conclusion

Weighing the factors enumerated above, particularly the similarity of the marks and the proximity of the markets, it is likely that consumers will perceive a food or grocery product bearing the mark or name PLUS as emanating from or associated with the Products' line of health food and nutritional products and will be confused as to the source of Foods' stores and products. As Judge Hand observed, "unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful." *Yale Electric Corp. v. Robertson,* 26 F.2d 972, 974 (2d Cir.1928). Products' survey results, although somewhat limited value, showed that 26% of the respondents viewed PLUS vitamins as a Foods brand. These consumers, apparently unfamiliar with Products but familiar with Foods, believed that Products' goods are made or sponsored by Foods when first encountering Products. This type of so-

**7.** This survey begins with two questions that expose the respondent to the word PLUS, followed by a key question that asks the respondent which store from a list of stores including PLUS is likely to sell vitamins named PLUS. This format leads the respondent to guess that PLUS stores sell PLUS vitamins through word association. *See Beneficial Corp. v. Beneficial*

*Capital Corp.,* 213 U.S.P.Q. (BNA) 1091, 1096 (S.D.N.Y.1982). *See also Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 264 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 439 F.Supp. 1022, 1043–44 (D.Del.1977), *rev'd on other grounds,* 589 F.2d 1225 (3d Cir.1978).

called "reverse confusion" may well damage Products because of Foods' deliberate "bargain basement" image.[8] *See Habitat Design Holdings Ltd. v. Habitat, Inc.,* 436 F.Supp. 327, 332 n. 5 (S.D.N.Y.1977), *aff'd,* 573 F.2d 1290 (2d Cir.1978). *See also Lever Bros. Co. v. American Bakeries Co., supra,* 693 F.2d at 258 (purpose of protecting mark on noncompeting goods is in part to guard against tarnishing reputation).[9]

### B. *Good Faith and Laches*

Before turning to a consideration of the balance of the equities, the other *Polaroid* factor, good faith, and the related doctrine of laches, deserve treatment. Both A & P and RVI, presumably the ultimate parties in interest here, are well known, well regarded corporations, equipped with superb counsel and all the resources of modern management. Under the facts as found above, the concept of good faith as customarily articulated is thin and of relatively little assistance for the issue is really one of the predictability of the outcome of the anticipated litigation.

As found above, Foods, through the Tenglemann Group, had a prior interest, economic and historical, in the use of "PLUS" in connection with food retailing of a particular kind. Indeed it is fair to infer from the testimony that these elements may have been part of the inducement that caused the Tengelmann Group to undertake its investment in American food retailing. That involvement undoubtedly caused Foods to challenge the position asserted by Products in the fall of 1979.

On the other hand, the accident of history and the course of Products' own change in corporate control resulted in a year's delay in its prosecution of this claim. Following the acquisition, Products moved reasonably expeditiously to prosecute its claim. Under these circumstances, the delay does not constitute acquiescence. *See Carl Zeiss Stiftung v. VEB Carl Zeiss Zena,* 293 F.Supp. 892, 918 (S.D.N.Y.1968), *aff'd,* 433 F.2d 686 (2d Cir.1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971).

Further, there has been no showing that Foods relied on any conduct of Products to plan its continued conduct of its business. *See Field Enterprises Education Corp. v. Grosset & Dunlap, Inc.,* 256 F.Supp. 382, 387 (S.D.N.Y.1966). It is also significant in this connection that Foods was aware of Products' claims even though they had not been vigorously enforced during the period when negotiations for a change of ownership were underway.

Foods was aware of Products' claims, had consulted counsel, and made an informal decision to adopt a course of action that might well, and did, result in litigation. However, there is no showing that this decision resulted in a commercial advantage to Foods, nor on the other hand, that Products has been monetarily damaged by the events to date. Indeed, there is no evidence that Foods adopted the PLUS mark in order to trade on Products' good name or goodwill.

Two major corporations have chosen to litigate an issue of trademark infringement, both aware of the consequences and both seeking to preserve the use of marks previously employed. There is no bad faith on the part of Foods or acquiescence by Products.

### C. *Balance of the Equities*

A consideration of the factors enumerated above reveals two major corporations, one a manufacturer and the other a retailer, both with vested interests in their respective marks, both aware of the consequences, seeking a determination of their

---

**8.** *See* note 4 *supra.*

**9.** This court's conclusion that there is a likelihood of confusion as to source is reinforced by the United States Patent and Trademark Office's rejection of Foods' application to register PLUS because of confusing similarity with three of plaintiff's registrations. This rejection has some weight. *W.E. Bassett Co. v. Revlon,*

*Inc.,* 305 F.Supp. 581, 598 (S.D.N.Y.1969), *modified on other grounds,* 435 F.2d 656 (2d Cir. 1970); *see Aloe Creme Laboratories, Inc. v. Texas Pharmacal Co.,* 335 F.2d 72, 74 (5th Cir.1964); *Esso Standard Oil Co. v. Sun Oil Co.,* 229 F.2d 37, 40 (D.C.Cir.), *cert. denied,* 351 U.S. 973, 76 S.Ct. 1027, 100 L.Ed. 1491 (1956).

rights. As this court perceives it, the balance of the equities weighs in favor of injunctive relief, but just barely.

Products' mark is weak but it is prior and similar to Foods', though slightly different in overall appearance. Certain of the products manufactured by Products are of the same character as those sold by Foods under its shelf talkers but not under its label. There is a probability that Products' line will expand; thus, potential competition exists with Foods' private label goods.

In addition, there is the potential of direct confusion as to the source of Products' merchandise in the event that its goods are sold at retail in supermarkets in geographical areas where Foods has stores. This geographical overlap is likely to occur as nutrition centers in supermarkets move east if Foods continues to move west.

There is no bad faith or acquiescence. The quality consideration, such as it is, weighs in favor of Products while the sophistication of the buyers goes in the other direction.

As between the parties then, the predominance of the equities is on the side of Products.

### D. The State Claims

Products also asserts state claims for trademark infringement and unfair competition, and for violation of the New York anti-dilution statute, N.Y.Gen.Bus.L. § 368–d. The infringement and unfair competition claims are adequately made out by the showing of likelihood of confusion and the balance of the equities weighing in favor of the senior user, as found above. *See Lambda Electronics Corp. v. Lambda Technology, Inc.,* 515 F.Supp. 915, 930 (S.D. N.Y.1981). As for the dilution claim, a likelihood of confusion as to source is not necessary. *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, at 624 (2d Cir.1983); *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 545, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1165 (1977). Rather, the New York statute authorizes injunctive relief in cases where there is a "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name." N.Y. Gen.Bus.L. § 368–d.

The statute only protects those trademarks or tradenames, however, that are "truly of *distinctive* quality or which have acquired a secondary meaning in the mind of the public." *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc., supra,* 42 N.Y.2d at 546, 399 N.Y.S.2d at 633, 369 N.E.2d at 1166 (emphasis in original). Furthermore, it has been suggested that the anti-dilution statute protects only extremely strong marks. *Sally Gee, Inc. v. Myra Hogan, Inc., supra,* at 625.

As found above, Products' mark is not very distinctive and, as such, is not subject to the protection afforded by the statute. In addition, the absence of predatory intent on Foods' part in its use of PLUS weighs against finding a violation of the statute. *See id.,* at 625–26.

### E. The Relief

Although the equities predominate on the side of Products in this case, it cannot expect to achieve a monopoly on the use of "PLUS." Indeed the decisional law is to the contrary, *see Plus Products v. Redken Laboratories, Inc.,* 199 U.S.P.Q. 111, 116 (T.T.A.B.1978) (noting practice of registering PLUS marks over Products' mark). Of course, the principal effort in this proceeding is not to allocate market shares to either RVI or A & P, but rather to seek to prevent consumers from either purchasing a product or refraining from a purchase because of a misapprehension as to its qualities or its source.

To this end, Foods will be enjoined from using its present logo until "Foods" is added to the logo in size and style equivalent to the use of "Plus." Foods shall also be enjoined from the use of its mark unless it posts in a prominent location a statement which disclaims any connection between Products and Foods, which disclaimer shall also be placed in any advertising material which refers to products of a character manufactured by Products. It will also be

enjoined from the use of shelf talkers using "PLUS" for vitamins, health foods, and dog and cat foods unless the manufacturer is also specified. It shall also be enjoined from the use of private labels on any products of a character also sold by Products unless a notice is posted prominently at the entrance of the Foods store stating that such private label products are not produced by Products.

No costs will be awarded. Submit judgment in accordance with this opinion within twenty (20) days of the date of filing of these findings and conclusions.

IT IS SO ORDERED.