LOIS SPORTSWEAR, U.S.A., INC., Plaintiff,

v.

LEVI STRAUSS & COMPANY, Defendant.

LEVI STRAUSS & COMPANY, Plaintiff,

v.

TEXTILES CONFECCIONES EUROPAS, S.A., Defendant.

Nos. 82 Civ. 8326(RWS), 83 Civ. 4338(RWS).

United States District Court, S.D. New York.

Sept. 30, 1985.

Whitman & Ransom, New York City, for Lois Sportswear, U.S.A., Inc. and Textiles Confecciones Europeas, S.A.; Max F. Schutzman, of counsel.

Milgrim Thomajan Jacobs & Lee, P.C., New York City, for Levi Strauss & Co.; Alfred T. Lee, Steven H. Hartman, of counsel.

## OPINION

SWEET, District Judge.

Declaratory judgment plaintiff Lois Sportswear, U.S.A., Inc. ("Lois") and defendant Textiles Y. Confecciones Europeas, S.A. ("Textiles") have both moved this court in this consolidated action for summary judgment pursuant to Fed.R.Civ.P. 56 granting the declaratory relief sought by Lois against defendant Levi Strauss & Company ("Levi") in 82 Civ. 8326 and dismissing the claims of Levi against Textiles in the related action, 83 Civ. 4338. Levi has cross-moved for summary judgment on both its complaint and its counterclaims. For the reasons discussed below, the motions of Lois and Textiles are denied, and Levi's motion is granted.

**The Parties**

Lois is a corporation organized under the laws of Delaware with a principal place of business in New York and is a member of a group of companies associated with Textiles, which is located in Valencia, Spain. Textiles is the manufacturer of wearing apparel bearing the Lois brand name, which has been sold throughout Europe for the past twenty-five years. Since 1979, Lois has been importing and distributing in the United States wearing apparel manufactured by Textiles, including jeans. Since the early 1960's, Lois brand five pocket trousers and jeans have exhibited a stitching design mark (the "Lois arcuate") on the rear pocket.

Levi is a corporation organized under the laws of Delaware, with its principal place of business in San Francisco, California. Levi has been in the business of manufacturing and distributing certain types of

wearing apparel, including jeans, since the 1850's. From 1873 to the present Levi has used a stitching design mark (the "Levi arcuate mark") on the rear pockets of Levi's jeans. Beginning with trademark registration No. 404,248, issued November 16, 1943, Levi has procured and presently owns federal trademark registrations for the Levi's arcuate mark.

## Prior Proceedings

The present controversy was initiated in 1979 when Levi lodged a protest with the United States Customs Bureau concerning the importation into the United States of Lois jeans bearing the Lois arcuate on the rear pockets that Levi asserted violated the trademark rights of Levi in the Levi arcuate. In early 1980 the Customs Service banned further importation of Lois jeans bearing the Lois arcuate mark on the ground that it was an infringement of the Levi's arcuate mark. On June 4, 1981 the Customs Service withdrew its ruling and permitted importation of Lois jeans. On June 30, 1982 the Customs Service once again reversed its ruling and banned further importations.

These consolidated actions were commenced on December 14, 1982 when Lois filed a complaint seeking a declaratory judgment that the Lois arcuate does not violate the trademark rights of Levi in the Levi's arcuate (82 Civ. 8326). Levi counterclaimed for injunctive and monetary relief, charging Lois with violations of the Lanham Act, common law trademark infringement and unfair competition, and trademark dilution in violation of New York law.

On the same day Lois also instituted an action in the Court of International Trade seeking an injunction against the United States and the commissioner of Customs charging interference with the importation and sale of Lois jeans. On May 3, 1983 the Honorable Bernard Newman granted a preliminary injunction against the Customs Service on the grounds that the ban was issued in violation of the Commission's procedural rules.

On June 8, 1983 Levi commenced a separate action in this court against Textiles (83 Civ. 4330), the supplier of Lois jeans to Lois Sportswear, seeking the same relief against Textiles as was alleged in the counterclaims against Lois. The answer and counterclaim filed by Textiles essentially track the complaint of Lois. On November 3, 1983 this court denied a motion by Textiles to dismiss the complaint. A factual hearing on the present summary judgment motions was held on July 12, 1985 at which depositions, exhibits and memoranda were submitted.

## The Facts.

The following facts are uncontested except where noted.

Levi Strauss has been manufacturing and distributing jeans and trousers exhibiting the Levi arcuate on the rear pockets since 1873. Levi has also employed the Levi arcuate on a variety of other denim items, including tote bags, address books, and attache cases. The Levi arcuate consists of two curved arches intercepting at midpoint. Levi Strauss has procured and presently owns federal trademark registrations for the Levi arcuate as follows:

| Reg. No. | Issue Date |
|---|---|
| 404,248 | November 16, 1943 |
| 1,139,254 | September 2, 1980 |
| 223,725 | February 8, 1968 |
| 849,437 | May 21, 1968 |
| 989,435 | July 30, 1975 |

It is acknowledged to be the oldest trademark in the apparel field currently in use.

Levi sells a variety of models of trousers and jeans, most of which exhibit the Levi arcuate on the rear pockets. Since 1972 alone, Levi has sold over 800 million pairs of jeans and trousers bearing the Levi arcuate.[1] Between 1972 and 1983 Levi's estimated expenditures for advertising in which the Levi arcuate appeared totalled approximately $102 million. Between 1980 and 1983 the estimated expenditures for advertising including the Levi arcuate totalled approximately $60 million.

---

1. Information concerning the total sales in the United States of jeans bearing the Levi arcuate between 1972 and 1983 was submitted by Levi as a confidential exhibit.

Textiles first began manufacturing and marketing jeans in Spain in 1957. Although the brand name Dylan was originally used, the brand name Lois was adopted in 1961. The Lois arcuate design was first used on the rear pockets of the Dylan brand jeans and has been used continuously on Lois brand jeans and trousers since 1961. The Lois arcuate consists of two curved arches intercepting at midpoint. The mark extends approximately three-quarters of an inch further towards the bottom pocket from the arcs intercept than the Levi arcuate. In 1979, Textiles applied for registration in Spain of the Lois arcuate and other very similar designs. According to Mr. Joaquin Saez Merino ("Saez Merino"), the president of Textiles, the origins of the stitched design are Mexican or Spanish. Saez Merino testified that Textiles did not become aware of Levi jeans until 1967 or 1968.

Lois' trousers generally consist of five pocket jeans made principally of denim and "fashion" jeans made of canvas or other fabrics. Most of the Lois jeans models have the Lois arcuate on the right rear pocket. Between 1979 and 1984 the total sales in the United States of all Lois trousers and jeans was approximately $4.8 million. The total estimated sales in the United States of Lois trousers and jeans exhibiting the Lois arcuate during this same time period was approximately $1.9 million. The approximate total promotional and advertising expenditures incurred by Lois for the promotion of all Lois jeans and trousers during the years 1980–1984 was approximately $3.2 million.

Both Lois and Levi brand jeans are sold with a variety of temporary and permanent labels affixed to the article identifying the brand name. According to Lois, most of its jeans have permanently affixed to them a two-inch by one-inch leather tag attached to the left rear pocket bearing the Lois brand name and bull symbol, a small fabric tag stitched to the right rear pocket featuring the Lois brand name, a sizing and care tag stitched to the inner waist seam which bears the Lois brand name and indicates that both the fabric and product are made in Spain, a brass button located at the waist band bearing the Lois name, and a quarter circle leather or fabric patch stitched to the right front pocket bearing the bull symbol. In addition, all models of Lois jeans are sold with hang tags prominently displaying the Lois brand name and with two stitched-on cardboard tags featuring the Lois name and bull symbol. Levi has submitted evidence that some Lois models have been offered for sale without any permanent marking on the rear of the jeans except for the arcuate and that other models have been displayed with the only other permanent marking on the rear the small fabric stitch on the right rear pocket.

Levi's jeans feature a permanently affixed red or orange pocket tab with the name Levi on the right rear pocket and a leather label (the Two Horse Brand label) sewn above the right pocket, as well as sewn-in labels and buttons bearing the Levi name. In addition, Levi's jeans are sold with two temporary cardboard labels, including one which mimics the arcuate design but largely obscures that portion of the back pocket where the arcuate design ordinarily appears. Many of these labels state "the colored tab and stitched pocket design are registered trademarks to help you identify garments made only by Levi Strauss & Co." The label mimicking the arcuate design represents the design that has been the Levi Strauss logo since 1968; it portrays the outline of the top half of Levi's jeans back pocket, ending at the lower border where it is contoured to simulate the Levi arcuate design. Levi submitted affidavits attesting that on some occasions Levi and Lois jeans are displayed in stores folded on racks or on hangers in a manner that preliminarily exhibits only the left rear pocket of Levi jeans and the right rear pocket of Lois jeans, sometimes with no marking visible at all except for the arcuates.

In 1984 the wholesale price of Lois' basic five pocket jeans was approximately $26–27 per pair, and the wholesale price of Lois' fashion model jeans averaged $4–5 higher. Lois recommends that its retailers use a

"keystone" mark up system, whereby goods purchased by Lois' retailers are generally sold at approximately twice the price paid to Lois. According to Lois, Lois' products have been sold to the public in the $60–80 price range. Lois concedes that it does not have control over the prices at which various retailers decide to sell its products and that on some occasions odd lots of Lois jeans have appeared at discount prices at half-price or less. Levi has submitted affidavits stating that Lois' jeans bearing the Lois arcuate have been offered for sale for as little as $12.99 at discount houses.

The average price at which Levi jeans are sold to retailers is approximately $10. Levi has not recommended retail resale prices since 1977. Levi's jeans are generally sold in the $20–30 range. Levi asserts, however, that it intends to introduce several higher priced lines of jeans and trousers. The average price in the trade for jeans is approximately $29.00. Levi contends that Lois has recently been disbanded as an operating company and that exclusive distribution rights for its line have been assigned to the Murjani Company, a firm that markets another jean brand at a lower price.

Much of Lois' advertising of its jeans and trousers emphasizes the fact that the jeans are imported from Europe and stresses that the jeans are a "fashion statement." One of Lois' advertisements portrays Lois' jeans and other apparel "Everyday sportswear for the filthy rich." Lois concedes that potential purchasers of Lois and Levi jeans are separated not by income differences but by individual preferences. Many of Levi's advertisements appear to place more emphasis on durability and fit rather than on fashion, although Levi submitted advertisements in which fashion or design was a major focus. Both Levi and Lois advertise on television. According to Lois, only a limited number of retail outlets have sold both Lois and Levi jeans, and in those cases they are generally sold in different departments. On occasion Lois jeans have been sold to The Gap, a national chain of stores with 543 outlets around the country that has been closely identified with Levi jeans, although no Lois jeans bearing the Lois' arcuate have been sold at The Gap.

Levi has submitted a consumer survey conducted by the market research firm of Bruno & Ridgway which Levi contends measures the degree to which consumers misassociated Lois' jeans with Levi jeans when the jeans were viewed in a simulated post-sale context. A male model was videotaped from a rear perspective while wearing a pair of jeans manufactured by Lois, Levi, Wrangler and J.C. Penney. The Wrangler jeans exhibit a "W" stitching design on the rear pockets. A triangle was stitched on the rear pocket of the J.C. Penney jean, which has no stitching design, in approximately the same size and location as the designs on the Lois, Levi and Wrangler jeans. The videotape, which was presented to the court at the factual hearing, allowed one of the back pockets to be seen at a distance of about six feet and was then followed by a zoom shot of the pocket. The videotapes of the Levi and Lois brands focused on the left rear pocket of the Levi jeans and the right rear pocket of the Lois jeans. All other labels or indicia other than the respective arcuates was removed from all of the jeans.

A total of 637 interviews, equally divided between males and females in the age range of 14 to 35, were conducted in six interviewing locations in different sections of the country. Respondents in each segment were intercepted in shopping malls and after being asked a series of screening questions, including whether or not they had purchased a pair of jeans in the last 12 months, were shown three videotaped segments, either Lois, Wrangler and the triangle design, or Levi, Wrangler and the triangle design. The respondents then were asked if they associated each pocket with a particular brand of jeans. Seventy-nine percent of respondents correctly identified the Levi arcuate and sixty-nine percent correctly recognized the Wrangler mark. Forty-three percent misassociated the Lois arcuate with Levi jeans. There were no identifications of the Lois arcuate with Lois

jeans. Ninety-four percent of respondents stated "I don't know" when shown the triangle design. Incorrect identification of jeans bearing the Levi arcuate with any brand other than Lois was eleven percent compared to seven percent for Wrangler and six percent for the triangle design. The respondents owned an average of 6.8 pairs of jeans. Lois contests the validity and admissibility of the survey and its results.

Levi has also submitted numerous exhibits and affidavits in support of its contention that the Levi arcuate has achieved a very high level of recognition and consumer association with Levi Strauss and has taken on its own meaning as a symbol. In addition to such evidence as newspaper, magazine and book references to the fame of the arcuate and high school yearbooks in which the arcuate was used as a front cover, Levi submitted evidence concerning the use of Levi's arcuate in the advertising of J.C. Penney Company, a national retail chain, as a means of signifying Levi's jeans. For six years J.C. Penney advertised its "plain pocket" brand of jeans by juxtaposing a picture of the unadorned pocket of a pair of J.C. Penney jeans with the picture of the rear pocket exhibiting the Levi arcuate of a pair of levi jeans. Although the picture often included the identifying Levi pocket tab on several occasions the tab was not present and only the arcuate was displayed.

**The Issue**

■ To sustain a claim of trademark infringement under 15 U.S.C. § 1114(1)(a), a plaintiff is required to demonstrate that the defendants' use of the same or similar mark is likely to cause confusion among potential consumers as to the source of its product. *Berlitz Schools of Languages Inc. v. Everest House*, 619 F.2d 211 (2d Cir.1980). Likelihood of confusion is also an essential element of an unfair competition claim based on section 43(a) of the Lanham Act, 15 U.S.C. § 1125, *Visa International Service Ass'n v. Visa Hotel Group, Inc.*, 561 F.Supp. 984 (D.C.Nev. 1983), as well as a common law claim of

unfair competition. In order to prevail on its claims of infringement and unfair competition, Levi must demonstrate that its arcuate mark is deserving of protection and that there is a likelihood of confusion between the marks.

■ As Lois concedes, Levi's registration of its arcuate mark has become incontestable under 15 U.S.C. § 1065 and constitutes conclusive evidence under 15 U.S.C. § 1115(b) of the exclusive right of Levi to its use. Incontestability bars any defense against that registration other than those set forth in 15 U.S.C. § 1115(b)(1)–(7), *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985), none of which has been asserted by Lois.

■ Because Levi's right to the exclusive use of its arcuate mark is incontestable, Levi will prevail if it can establish a "likelihood that the consuming public will be confused as to the source of the allegedly infringing product." *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 664 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). Although the likelihood of confusion is primarily a question of fact, summary judgment for a defendant is appropriate if a visual comparison reveals that the two marks are not substantially similar. *See Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 915 (2d Cir.1980); *Universal City Studios v. Nintendo Co.*, 578 F.Supp. 911, 927 (S.D.N.Y.1983). In claims brought under the Lanham Act "courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion as to source." *Warner Brothers, Inc. v. American Broadcasting Companies, Inc.*, 720 F.2d 231, 246 (2d Cir.1983). In certain instances, summary judgment for a plaintiff may be appropriate if the record is sufficiently developed and the infringement is clear as a matter of law. *Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F.Supp. 947, 954 (S.D.N.Y.1980); *Rolls-Royce Mo-*

*tors, Ltd. v. A & A Fiberglass, Inc.,* 428 F.Supp. 689 (N.D.Ga.1977).

## The Polaroid Factors

In *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), the Second Circuit noted the factors that must be examined in making a determination as to the likelihood of confusion:

> [The] strength of [the] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account.

*Id.* at 495. No single factor is determinative. Instead, all the factors must be considered together according to the degree to which each is implicated. *Lambda Electronics Corp. v. Lambda Tech., Inc.,* 515 F.Supp. 915, 925 (S.D.N.Y.1981).

### 1. Strength of Levi Arcuate Mark

■ The Second Circuit has held that: [t]he term "strength" as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as enamating from a particular, although possibly anonymous, source.

*McGregor-Doniger Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). Arbitrary and fanciful marks which are non-descriptive and non-suggestive are by their very nature distinctive and strong trademarks. *Plus Products v. Plus Discount Foods, Inc.,* 564 F.Supp. 984, 990 (S.D.N.Y.), *aff'd in part, rev'd in part* 722 F.2d 999 (2nd Cir.1983); *see also Proctor & Gamble Co. v. Johnson & Johnson, Inc.,* 485 F.Supp. 1185, 1197 (S.D.N.Y.1979), *aff'd,* 636 F.2d 1203 (2d Cir.1980). A registered mark is also accorded the highest degree of protection. *Vibrant Sales, Inc. v. New Body Boutique, Inc.,* 652 F.2d 299, 304 (2d Cir.1981), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982) ("[r]egistered marks are presumed to represent the source in the minds of the public …") The strength of a mark, however, may be diminished by the existence of similar marks used in connection with similar products. *See Lambda Electronics v. Lambda Tech., Inc., supra,* 515 F.Supp. at 925.

■ Based on the above analysis, Levi's arcuate mark is a strong mark that qualifies for a high degree of protection. In addition to its status as an incontestable registered mark, the Levi's arcuate mark is a fanciful design which has no function other than as a source indicator. Furthermore, assuming Levi needed to establish secondary meaning, Levi has presented evidence of widespread advertising and promotion of Levi's jeans featuring the Levi's arcuate mark, continuous use of the mark for more than a century, and sales of more than 800 million pair of jeans bearing the Levi's mark since 1971. Evidence of sales success, advertising expenditures, and length and exclusivity of use are factors relevant to a determination of the strength of a mark. *See Harlequin Enterprises Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 949 (2d Cir.1981); *Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 821 (9th Cir.1980).

In addition, Lois' claim that Levi's mark has been significantly weakened by third party use is not convincing. Although Lois points to the decision in *Plus Products v. Plus Discount Foods, Inc., supra,* 564 F.Supp. 984 (S.D.N.Y.), in which the senior user's mark was found to lack strength and distinctiveness partly on the basis of extensive third party use evidenced by cease and desist letters, as analogous, courts have generally accorded no weight to third party use that is not attributable to the inherent descriptiveness or suggestiveness of a mark, on the theory that two wrongs do not make a right. *See National Lead Co. v. Wolfe,* 223 F.2d 195, 204 (9th Cir.1955),

*cert. denied,* 350 U.S. 883, 76 S.Ct. 135, 100 L.Ed. 778 (1955); *Harold F. Ritchie Inc. v. Chesebrough Pond's, Inc.,* 281 F.2d 755 (2d Cir.1960).

Additionally, even assuming that the examples presented by Lois are infringements of Levi's mark, Lois has not demonstrated either the extent to which the allegedly infringing designs have been used or the degree to which they may have diminished the effectiveness of the Levi mark as an identifying source. In the particular context of this case, the fact that the Levi arcuate may have been to some degree duplicated by other jeans manufacturers serves more to bolster its claim of a strong mark rather than weaken it.

In *Plus Products,* the work mark PLUS was held to be a suggestive mark "lacking in originality and uniqueness," 564 F.Supp. at 990, and the extensive third party use of the mark was seen as further evidence of its weak and generic character. *Plus Products,* 722 F.2d at 1005. In the present case, on the other hand, the use by competitors of an inherently strong and fanciful mark suggests not its generic nature but its strength as an effective symbol or sales tool. Based on the facts as presented by Lois, Levi has successfully shown that its arcuate is a strong mark.

### 2. Similarity of Marks

A visual inspection of the two marks reveals that although there are distinguishing factors the marks are essentially identical. Both marks consist of two curved arches intercepting at midpoint. The marks are of the same general size, and from any distance it would be difficult to accurately distinguish them. Both marks appear at precisely the same location on similar pairs of jeans. The Lois mark extends approximately three-quarters of an inch further towards the bottom pocket from the arcs intercept, thus creating to a limited extent an impression of a letter "Y"

as compared to the "V" impression of the Levi design. However, absent any other markings, the marks are visually extremely similar and create "the same general overall impression." *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1060 (2d Cir.1979); *see also Universal City Studios v. Nintendo Co.,* 578 F.Supp. 911 (S.D.N. Y.), *aff'd,* 746 F.2d 112 (2d Cir.1984).[2]

In assessing similarity, however, the overall context in which the marks appear must be considered. *McGregor-Doniger Inc. v. Drizzle, Inc., supra,* 599 F.2d at 1133. Lois contends that because the products have additional markings attached, both permanently and at the point of sale, the marks are not similar given their "overall packaging ·context." *Lever Brothers Co. v. American Bakeries Co.,* 693 F.2d 251, 257 (2d Cir.1982). According to Lois, the presence of this additional labelling serves to differentiate the marks and avoid any possibility of confusion.

However, while this evidence of other indicia of origin may affect a determination of likelihood of confusion, *see* discussion, *infra,* since in certain cases courts have denied relief in infringement actions on the grounds that "[t]he presence of [defendant's] name on the product goes far to eliminate confusion of origin," *Bose Corp. v. Linear Design Labs, Inc.,* 467 F.2d 304, 309 (2d Cir.1972), it does not render the relevant marks dissimilar. The settings in which each of the marks are used are essentially the same and do not color the impression created by each mark in a manner which differentiates them. Whether or not the manner in which each mark is presented, either in market conditions or post-sale, dispels any reasonable possibility that a consumer might be confused as to source, it does not affect the degree of similarity between the two arcuate designs.

### 3. Proximity of the Products and Bridging the Gap

Although the marks in question appear on the same basic product, Lois contends

2. In *Levi Strauss & Co. v. Fuller Longley,* 272 F.2d 820 (6th Cir.1959), the Sixth Circuit found a defendant's use of an arcuate dropping to the center of the bottom of the pocket to be confus-

ingly similar, although the court ultimately determined on the basis of the existence of other indicia of origin that there was no infringement.

that the products are non-competing and sold in dissimilar markets. As found above, the parties' jeans are generally sold at disparate prices and in different stores. In addition, the advertising of each party is directed towards somewhat different markets.

However, the degree of overlap between the markets is difficult to determine. Furthermore, Lois concedes that it does not have control over the prices at which various retailers decide to sell its product, and on some occasions Lois jeans have appeared in "close-out" stores at discount prices. Based solely on the information submitted by Lois, it appears that the differences between the products is not so great as to render them merely "proximate" and noncompetitive, *see Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 623 (2d Cir.1983), although they are sufficient to create a limited "competitive distance" between the products, *McGregor-Doniger v. Drizzle, supra,* that may serve to decrease the likelihood of consumer confusion.

Levi has also asserted that it intends to introduce several higher priced lines of jeans and trousers, thus bridging any gap that might exist between the products. However, since Levi has not alleged that any of these higher priced lines would bear the Levi arcuate, it has failed to establish with any certainty that it is likely to bridge any gap between the products.

**4. Sophistication of Buyer**

Lois suggests that because of the "substantial" prices charged for its products, potential consumers could be expected to exercise care in their selection of goods, although it is conceded that on various occasions its goods are sold at considerably discounted prices. In addition, Lois maintains that potential purchasers of Lois and Levi jeans are separated not by income differences but by individual preferences. From the size of the respective markets and the absence of any identifying characteristics of the purchasers, it may be presumed that a relatively high degree of sophistication is found with respect to Lois jeans purchasers.

**5. Quality of Lois Jeans**

For purposes of this motion Levi has admitted that Lois jeans are not qualitatively inferior to Levi's jeans. The qualitative advantages that Lois contends distinguish Lois' jeans from Levi's jeans may serve to differentiate the products with consumers.

**6. Good Faith of Lois**

Levi contends that because Lois must have been aware of Levi's registration when it began marketing Lois arcuate bearing jeans in the United States, its action was taken in bad faith. Levi also points to Lois' attempt to have its arcuate registered in Spain as further evidence of bad faith. However, in the context of this case Lois' decision to proceed with a similar mark does not represent convincing evidence of bad faith. Lois' continuous use of the mark since 1959, when coupled with Lois' explanation of the origins of the Lois arcuate, act to refute Levi's claims of bad faith.

**7. Actual Confusion**

Levi acknowledges that it has not presented any evidence of instances of actual confusion in this case. As courts have noted, however:

> [a]ctual confusion or deception of purchasers is not essential to a finding of trademark infringement or unfair competition, it being recognized that "reliable evidence of actual instances of confusion is practically almost impossible to secure."

*Ritchie, Inc. v. Chesebrough-Ponds, Inc., supra,* 281 F.2d at 761. In any event, in this case, Lois' use of the mark in issue in the United States was not on such a substantial scale as to render the lack of evidence of confusion highly significant. Total sales during the period of 1979–1984 of $1.9 million, while not insignificant, are small relative to Levi's sales of jeans and

trousers bearing its arcuate during that period.

Although Levi has been unable to provide examples of actual confusion, it has submitted the Bruno & Ridgway survey as evidence of the high probability of confusion that may be expected. Granting the survey's admissibility, a finding of a 43% level of confusion would constitute some evidence to support a finding of likely confusion. *See, e.g., RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (survey indicating 15%–20% level of confusion significant evidence); *Coca Cola Company v. Tropicana Products*, 690 F.2d 312 (2d Cir.1982) (15%). However, Lois contends that the survey should be rejected because it failed to simulate the appearance of the products at the point of sale and instead measured only post-sale confusion. According to Lois, the fact that all indicia or identifying marks other than the arcuates were removed from the jeans and the jeans were viewed only from the rear renders the survey not only inadmissible but without weight.

■ Whether or not evidence of post-sale confusion is probative of infringement in this case, *see* discussion, *infra*, the Bruno & Ridgway survey is only entitled to limited weight because of various methodological defects. The deposition testimony of Mr. A. Spencer Bruno ("Bruno"), founder and president of Bruno & Ridgway and the individual who devised the survey, reveals that no real criteria was established for selecting the cities in which the mall intercept interviews took place. No effort was made to determine if Levi jeans were widely sold in the area or if either Lois or Wrangler jeans were sold at all in the area. In addition, it is unclear on what basis Levi Strauss selected the particular universe chosen. As a general rule, mall intercept studies, though less expensive, are less reliable than studies based on a statistically valid sample. Furthermore, although the survey was intended to duplicate the manner in which jeans were worn and seen by others in a commonplace public setting, the jeans used in the survey were devoid of all

identifying marks, including permanent marks such as the Levi pocket tab that would normally remain on the garment after sale. While the trustworthiness and genuineness of the survey are satisfactorily established by the evidence, these methodological defects significantly reduce the weight to which the survey is entitled.

**Other Relevant Considerations**

An assessment of just the factors discussed above would require the conclusion that the two marks are confusingly similar. The strength of the Levi mark and the high degree of literal similarity between the two marks outweigh the relatively minor differences between the products themselves and their markets, and the absence of any evidence of actual confusion is not significant in the context of this case. Lois contends, however, that despite any literal similarity between the marks, the existence of other indicia of origin on the jeans completely obviates the likelihood of any confusion among purchasing consumers. As noted above, in many instances "[t]he presence of [defendants'] name on the product goes far to eliminate confusion of origin." *Bose Corporation v. Linear Design Labs, Inc.*, 467 F.2d 304, 309 (2d Cir.1972); *see also American Rolex Watch Corp. v. Ricoh Time Corporation*, 491 F.2d 877, 879 (2d Cir.1974); *Levi Strauss v. Fuller Longley*, 272 F.2d 820 (6th Cir.1959); *Le Sportsac, Inc. v. Dockside Research Inc.*, 478 F.Supp. 602 (S.D.N.Y.1979).

■ The presence of brand names will significantly lessen the possibility of confusion where the contested mark is inherently weak, *see Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 372 (1st Cir.1980), or where the infringement in question involves the copying of a functional, and therefore unprotectible, product configuration, *see Fisher Stoves Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 195 (1st Cir.1980). In addition, where a mark always appears with a brand name the effect may be to preclude the mark from having any secondary meaning or distinctiveness on its own. *See, e.g., McGregor-Doniger v.*

*Drizzle, Inc., supra; Thompson Medical Co. v. Pfizer, Inc.,* 753 F.2d 208, 214–15 (2d Cir.1985).

■ Courts have held, however, that where a strong mark is involved the addition of identifying labelling may be insufficient to eliminate the likelihood of confusion. *See, e.g., Polo Fashions, Inc. v. Extra Special Products, Inc.,* 451 F.Supp. 555, 560 (S.D.N.Y.1978) (mark "POLO" by Ralph Lauren infringed by "Polo by Marco Polo" despite distinguishing phrase); *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,* 470 F.2d 689 (2d Cir.1972) ("LaCrosse by Bradley" confusingly similar to "Cross"); *Source Perrier, S.A. v. Waters of Saratoga Springs, Inc.,* 217 U.S.P.Q. 617, 620 (S.D.N.Y.1982) (label fails to obviate confusion created by use of similar bottle). The Second Circuit has noted that a defendant's use of a mark in conjunction with its corporate name may serve to promote confusion with the similar mark of a competitor rather than ensure against it because it may unfairly couple the benefits of the mark with the selling power of the infringer's name. *W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 662 (2d Cir.1970) (mark "Revlon Cuti-Trim" infringed plaintiff's mark "Cuti-Trim" despite addition of corporate name.) Similarly, the fact that a plaintiff always uses a mark in conjunction with its name does not necessarily mean that a competitor is free to use that mark or a similar one on its own or in conjunction with that competitor's own name. *See Polo Fashions, supra.*

In the present case, the Levi acurate mark is not merely a fragment of a larger mark including the Levi name but instead has an independent degree of recognition and connection with Levi Strauss, unlike, for example, the McGregor-Drizzle mark in *McGregor-Doniger, supra.* The use of a similar mark by Lois in connection with the Lois brand name may tend to confuse purchasers at the point of sale as to the possibility of an association between Levi and Lois. *See Dreyfus Fund Inc. v. Royal Bank of Canada,* 525 F.Supp. 1108, 1122 (S.D.N.Y.1981). While the identifying labels may reduce to some extent the possibility of point of sale confusion, given the strength of the Levi mark and the similarity between the designs as well as the manner in which they are seen by prospective customers, the presence of other identifying indicia is not sufficient to dispel the possibility of confusing similarity between the marks as seen at the point of sale.[3] There is not a case where a logo is "prominently and repetitively printed" across one of the products, *see Le Sportsac, Inc. v. Dockside Research, Inc.,* 478 F.Supp. 602, 609 (S.D.N.Y.1979), thus affecting the overall impression of the product and clearly differentiating the product. The additional labelling on the products is not necessarily enough to assure that all confusion is dispelled, despite the addition of different brand names.

In any event, the marks must also be assessed for confusing similarity in a post-sale situation where many of the identifying factors will not be present. Although the Lanham Act originally restricted its definition of confusion to confusion of actual purchasers or confusion as to source, in 1962 Congress amended the section to delete that limitation, "thereby evincing a clear purpose to outlaw the use of trademarks which are likely to cause confusion, mistake or deception of any kind, not merely of purchasers nor simply as to source of origin." *Syntex Labs v. Norwich Pharmacal Co.,* 437 F.2d 566, 568 (2d Cir.1971) (product confusion among non-purchasing prescribing doctors actionable); *see also Grotrian, Helfferich, Schultz v. Steinway & Sons,* 523 F.2d 1331 (2d Cir.1975).

**3.** The Sixth Circuit's decision in *Levi Strauss v. Fuller Longley, supra,* in which the court reached a contrary determination when considering the likelihood of confusion between the Levi arcuate and the arcuate of a brand plainly bearing a different trade name and trade design, is not persuasive. The court focused primarily on the likelihood of actual confusion among purchasers as to which brand they were purchasing. Furthermore, the case was decided under the original infringement section of the Lanham Act and thus did not take post sale confusion into account. *See* discussion *infra.*

Although point of sale confusion among purchasers is the focus of most trademark infringement cases, *see, e.g., Mennen Co. v. Gillette Co.*, 565 F.Supp. 648 (S.D.N.Y. 1983); *Lever Bros. Co. v. American Bakeries Co.*, 693 F.2d 251 (2d Cir.1982); *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999 (2d Cir.1983), courts have relied on the possibility of non-sale or general public confusion to enjoin the use of marks in infringement cases. *See, e.g., Grotrian, Helfferich v. Steinway & Sons, supra; Dreyfus Fund v. Royal Bank of Canada*, 525 F.Supp. 1108, 1122–23 (S.D.N.Y.1981); *Rolls-Royce Motors Ltd. v. A & A Fiberglass, Inc.*, 428 F.Supp. 689 (N.D.Ga.1976); *AMP Inc. v. Foy*, 540 F.2d 1181 (4th Cir. 1976); *Levi Strauss v. Blue Bell, Inc.*, 632 F.2d 817 (9th Cir.1980). In *Levi Strauss v. Blue Bell, Inc.*, an infringement action brought by Levi based on its pocket tab trademark, the Ninth Circuit stated:

> Wrangler focuses upon the condition of its pants when sold and limits its arguments to "point of sale" circumstances. However, billboards and other point of sale material are removed by the purchaser and have no confusion-obviating effect when the pants are worn. Wrangler's use of its projecting label is likely to cause confusion among purchasers who carry even an imperfect recollection of Levi Strauss' mark and who observe Wrangler's projecting label after the point of sale. It is axiomatic in trademark law that "side-by-side" comparison is not the test.

*Id.* at 822 (emphasis in original).

In *Grotrian, Helfferich v. Steinway, supra*, in which the Second Circuit determined that a foreign piano manufacturer's use of the mark "Grotrian-Steinweg" infringed the tradenames "Steinway" and "Steinway & Sons" of a domestic piano manufacturer, the court held that it was not necessary to demonstrate actual or potential confusion at the time of sale, given the circumstances of the case. The court noted that although given the degree of care likely to be exercised in purchasing a piano, there was no likelihood that a purchaser would actually buy a Grotrian-Steinway thinking it was actually a Steinway or in some way connected with Steinway & Sons, a consumer might consider a Grotrian-Steinweg under the mistaken impression that it was somehow connected with "Steinway." Grotrian's use of the Grotrian-Steinweg name, therefore, would attract potential customers based on the reputation built up by Steinway. *Id.* at 1342. Similarly, in the *Rolls-Royce* cases the courts found that even though the purchasers of kits enabling owners of inexpensive cars to decorate them with Rolls-Royce type grills were under no confusion as to source, the possibility that members of the public might be confused was sufficient.

Given the product at issue in this case, an assessment of post-sale confusion is relevant to a determination of infringement. Unlike many of the cases cited by Lois in which an assessment of potential confusion was limited to confusion in a marketplace setting at the point of sale, the case at hand involves a mark which has an impact on both prospective customers and the general public after the point of sale. The possibility of post or non-sale confusion among prospective purchasers is not a significant factor in cases involving products which are not generally visible post-sale, such as food products or toiletries, *see Plus Products, supra*, or where the mark in question is not highly visible even if the product remains in circulation, *see McGregor-Doniger, supra* (mark on inside label); *American Footwear Corp. v. General Footwear Co., supra*, 609 F.2d at 659 n. 1 (2d Cir.1979) (mark on heel pad of shoe).[4]

---

**4.** This court's decision in *Aris-Isotoner, supra*, which did involve a mark clearly visible after the point of sale, is not inconsistent with this conclusion. The *Aris-Isotoner* opinion did not reject post-sale confusion, although it gave less weight to a survey which was not conducted under marketing conditions, but instead found infringement at the point of sale despite the presence of other identifying marks. This conclusion is further supported by the Second Circuit's recent opinion in *Le Sportsac*, in which the court found significant the fact that the hangtag could be removed, thus leaving the bags identical.

In this case, the mark is likely to be viewed frequently in a non-sale setting after point of sale labels are removed and cause confusion among both prospective customers and the general public. *See Dreyfus Fund v. Royal Bank of Canada, supra* (confusion need not persist through process of purchase and cause lost sales). Even if the likelihood that a consumer might accidentally purchase a pair of Lois jeans under the mistaken impression that they were manufactured by Levi were small, any general confusion as to the source of jeans viewed by potential customers outside of stores may be actionable. This confusion may diminish the goodwill and sales power created by the Levi arcuate in that it might cause potential purchasers viewing a pair of Levi's from the distance to enter a store and buy Lois jeans, believing them to be what they had seen, or a Levis' customer to decide against buying Levis based on his appraisal of Lois jeans, believing them to be the same. Similarity between the marks might create a subliminal confusion allowing Lois to "gain a foothold in its market by exploiting subliminal or conscious association with [the plaintiff] ..." *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.,* 486 F.Supp. 414 at 428 (S.D.N.Y.1986); *Dreyfus Fund v. Royal Bank, supra,* 525 F.Supp. at 1123. Because the mark is consistently visible to the purchasing public as a constant advertisement of the product on which an evaluation of it is affixed, the similarity of the marks in a post-sale setting must be taken into consideration.

Although "permanent" markings bearing the Levi and Lois names remain on the products after the point of sale, the limited degree to which they would be visible in a public setting obviates any ability they might have to reduce the possibility of confusion. The only permanent marking on the rear of all Lois jeans, other than the arcuate, is a label sewn on the left rear pocket. Some Lois jeans also have a very small sewn-in label on the top of the right pocket. Levi's jeans bear both a waistband patch above the right pocket and the Levi's pocket tab on that same pocket. Assuming

the Levi patch were not covered by a belt or removed, it is not necessarily distinguishable from other patches and like the Lois labels may not be visible from a distance. These other markings are not so strong as to alter the general impression of similarity created by the two marks. In any event, as Lois points out, there are no distinguishing marks between Levi jeans and some models of Lois jeans if the Levi jean is viewed from the rear left and the Lois jean from the rear right. In post-sale context, the marks are sufficiently similar so as to create a strong possibility of confusion among prospective purchasers as to the source of the respective products.

This conclusion is, of course, supported by the findings of the Bruno & Ridgway survey. As noted above, the fact that the survey did not duplicate market conditions at the point of sale does not render it irrelevant, since in the circumstances of this case post-sale confusion may be actionable. Although courts have frequently rejected surveys which were not conducted under actual marketing conditions, *see, e.g., American Footwear Corp. v. General Footwear Co., supra* in the present case, the degree of confusion created among general public is sufficiently relevant to make such a survey probative. In *Rolls-Royce Motors Ltd. v. Custom Cloud Motors, Inc.,* 190 U.S.P.Q. 80 (S.D.N.Y.1976), the court relied on a survey of 100 persons who were stopped at random in midtown Manhattan and shown a picture of a car with the defendant's grill attached. Because in the present case post-sale confusion is a relevant factor, the fact the Bruno & Ridgway survey duplicated the manner in which the goods would be viewed by the general public after a sale does not render it inadmissible. As noted above, however, the survey is entitled to limited probative weight because of various methodological defects.

**The Conclusion**

Even without the survey the information presented is sufficient to allow the conclusion, as a matter of law, that Lois' use of its mark infringed on Levi's arcuate

mark. The Levi arcuate is a strong mark entitled to a great degree of protection. The marks are essentially identical when viewed side by side as well as under market conditions; although the addition of identifying labelling reduces the possibility of actual confusion among purchasers at the moment of sale, it does not eliminate the likelihood of confusion as to association between the products at the point of sale or the possibility that the similar mark might serve as a lure. Furthermore, even if the additional labelling were sufficient to avoid any point of sale confusion, there is a substantial likelihood of confusion among prospective purchasers viewing the marks in a post-sale context. This likelihood of confusion is not significantly ameliorated by any differences between the two products themselves or their specific markets, particularly since differences in price or market will not affect confusion among prospective purchasers in a non-sale context.

Given the above factors, the absence of evidence of actual confusion does not reduce the likelihood of confusion. The marks are sufficiently similar as to present a substantial likelihood that prospective purchasers would be confused as to the source of the relevant goods and that the good will and advertising effectiveness built up in the Levi arcuate would be significantly reduced.

Despite the fact that issues of distinctiveness and likelihood of confusion are factual in nature, summary judgment for Levi is justified in this case because the legal issues have been squarely presented, the parties both have sought judgment on the present record, and a trial is not likely to develop additional evidence helpful to either side. For purposes of the resolution of this motion all of the factual disputes that Lois claims remain unresolved have been decided in Lois' favor. Lois' attempts to diminish the extent to which the Levi mark has acquired secondary meaning are irrelevant given the Levi arcuate status as both a fanciful and a registered mark. Any lack of competitiveness of the products does not affect the level of confusion that is likely to enure among prospective

purchasers who might never become aware of their confusion. Finally, an evaluation of the *Polaroid* factors reveals a substantial likelihood of confusion even without taking into account the contested Bruno & Ridgeway survey.

Because there are no genuine issues of material fact left to be resolved and the record is well developed, "[d]enial of summary judgment in this instance, where the record is well-developed and the alternative is a non-jury trial in which the court is required to draw the same inferences from the same evidence, would be unfair to the litigants and waste judicial resources." *Rolls-Royce Motors Ltd. v. A & A Fiberglass, Inc., supra,* 428 F.Supp. at 695. Levi is entitled to summary judgment under its trademark infringement claims and its claim brought under § 43(a) of the Lanham Act as well as under its common law claims of unfair competition.

Summary judgment is also appropriate on Levi's claim under New York's antidilution statute, N.Y.Gen. Business Law § 368–d (McKinney), which reads:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, not withstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

The anti-dilution law is designed to protect the distinctiveness of an owner's trademark from being undercut by another. *Mortellito v. Nina of California, Inc.,* 335 F.Supp. 1288, 1290 (S.D.N.Y.1972); *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (Ct.App.1977). As the Second Circuit stated in *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621 (2d Cir.1983):

> The interest protected by § 368–d is not simply commercial goodwill but the selling power that a distinctive mark or

name with favorable associations has engendered for a product in the mind of the consuming public.

*Id.* at 624–25. In this case, the Levi mark has been shown to be of "distinctive quality," *id.* at 625, and the evidence also establishes the danger that Lois' use of its mark will blur the identification between Levi jeans and the Levi Arcuate. The above reasoning as to infringement and dilution equally supports granting summary judgment under New York unfair competition provision, N.Y.Gen.Bus. Law § 349 (McKinney 1968).

For the reasons discussed above, Lois's motion for summary judgment is denied and Levi's motion for summary judgment and an injunction is granted.

Submit judgment on notice.

IT IS SO ORDERED.